UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| OFFICEMAX INCORPORATED | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:09-cv-00631-JAW |
| | ) | |
| DENIS SOUSA, GEORGE JOHNSON | ) | |
| and JOHN STEELE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT, TO STRIKE, FOR SANCTIONS, AND TO SUPPLEMENT

In this civil action, OfficeMax filed suit against its former employees—now working for its competitor W.B. Mason—to prevent them from violating the terms of their non-competition agreements and to prevent them from revealing confidential OfficeMax trade information. The Defendants, Denis Sousa, George Johnson, and John Steele, have fought back, not merely denying OfficeMax's legal claims but counterclaiming against OfficeMax, seeking a declaratory judgment and alleging that OfficeMax committed torts against them and violated state of Maine statutory law. What began as a skirmish devolved into a major dispositive motion battle with multiple charges and counterattacks. In this exhaustive order, the Court picks its way through the volleys, declares some minor victories, but for the most part orders the adversaries back to where they began.

## I. STATEMENT OF FACTS

### A. Procedural History

### 1. Complaints, Answers, Motions to Dismiss and Counterclaims

On December 18, 2009, OfficeMax Incorporated (OfficeMax) filed suit against Denis Sousa, George Johnson and John Steele, seeking recovery for alleged violations of nondisclosure and noncompetition agreements that the Defendants signed while they were employed by OfficeMax and its predecessor, Boise Cascade Office Products (BCOP). *Compl.* at 1 (Docket #1). Johnson answered on February 3, 2010. *Answer, Affirmative Defenses and Jury Demand of Def. George Johnson* (Docket # 9) (*Johnson Answer*). On February 8, 2010, Mr. Steele moved to dismiss pursuant to Rule 12(b)(6). *Def. John Steele's Mot. to Dismiss Pursuant to Rule 12(b)(6)* (Docket # 11) (*Steele Mot. to Dismiss*). On February 11, 2010, Mr. Sousa answered. *Answer, Affirmative Defenses and Jury Demand of Def. Denis Sousa* (Docket # 12) (*Sousa Answer*). On February 24, 2010, OfficeMax moved for preliminary injunction. *Mot. for Prelim. Inj.* (Docket # 15). On March 1, 2010, OfficeMax responded to Mr. Steele's Motion to Dismiss. *Pl.'s Opp'n to the Mot. to Dismiss Filed by Def. Steele.* (Docket # 20) (*Opp'n to Mot. to Dismiss*). On March 19, 2010, District Court Judge Hornby denied Mr. Steele's Motion to Dismiss, stating that "[t]here may ultimately be a basis for summary judgment, but the allegations just barely survive a motion to dismiss." *Order Den. Mot. to Dismiss* (Docket # 26). On April 2, 2010, Mr. Steele answered OfficeMax's Complaint and asserted a counterclaim, alleging breach of contract, fraud, violation of the Maine Timely and Full Payment of Wages Law, 26 M.R.S. § 621-A *et seq.*, abuse of process, and defamation, and requesting a declaratory judgment. *Answer, Affirmative Defenses,*

*Countercl. and Jury Demand of Def. John Steele* (Docket # 28) (*Steele Answer and Countercls.*).  On April 27, 2010, OfficeMax answered Mr. Steele's counterclaims. *Answer of OfficeMax Incorporated to Countercl. of John Steele* (Docket # 38) (*OfficeMax Answer*).

On July 23, 2010, Messrs. Sousa and Johnson filed an amended answer asserting a counterclaim, alleging abuse of process and seeking a declaratory judgment.[1] *Countercl. of Def. George Johnson* (Docket # 68) (*Johnson Countercl.*); *Countercl. of Def. Denis Sousa* (Docket # 69) (*Sousa Countercl.*).  On August 13, 2010, OfficeMax answered Mr. Johnson's and Mr. Sousa's counterclaims.  *Answer of OfficeMax Incorporated to Countercl. of George Johnson* (Docket # 87); *Answer of OfficeMax Incorporated to Countercl. of Denis Sousa* (Docket # 88).

### 2. Defendants' Motions for Summary Judgment, to Strike, and for Sanctions

On June 18, 2010, Messrs. Johnson and Sousa moved for Summary Judgment. *Mot. of Defs. Denis Sousa and George Johnson for Summ. J.* (Docket # 47) (*Sousa and Johnson Summ. J. Mot.*).  Mr. Steele followed on June 24, 2010. *Def. John Steele's Mot. for Summ. J.* (Docket # 50) (*Steele Summ. J. Mot.*). OfficeMax responded to Mr. Steele's summary judgment motion on July 15, 2010, and to Messrs. Johnson and Sousa's motion on July 16, 2010, opposing summary judgment or, in the alternative, requesting additional time for discovery. *Pl.'s Mot. for Extension of Time to Conduct Disc. and Opp'n to Summ. J. Mot. of Def. Steele*

---

[1] OfficeMax objected to the proposed amendments on the grounds of futility and bad faith. *Pl.'s Opp'n to Defs.' Mot. for Leave to Amend Their Answer to Assert Countercls.* (Docket # 46).  On July 7, 2010, the Magistrate Judge granted the motion to amend over OfficeMax's objection. *Order on Mot. to Amend* (Docket # 56).

(Docket # 59) (*Pl.'s Opp'n to Steele Mot.*); *Pl.'s Appl. Under Fed. R. Civ. P. 56(f) and Opp'n to Defs.' Mot. for Summ. J.* (Docket # 66) (*Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.*). On July 29, 2010, Messrs. Steele, Sousa and Johnson replied to OfficeMax's opposition. *Def. Steele's Reply in Supp. of His Mot. for Summ. J.* (Docket # 76) (*Steele Summ. J. Reply*); *Defs. Sousa and Johnson's Reply in Supp. of Their Mot. for Summ. J.* (Docket # 78) (*Sousa and Johnson Summ. J. Reply*).

On the same day, Mr. Steele moved to strike Exhibit F from OfficeMax's opposition. *Def. Steele's Mot. to Strike Ex. Submitted by Pl. in Opp'n to Steele's Mot. for Summ. J. on the Grounds that Pl. Withheld This Doc. in Disc. Claiming It Was Irrelevant* (Docket # 77) (*Steele Mot. to Strike*). OfficeMax responded to Mr. Steele's Motion to Strike on August 23, 2010. *Pl.'s Opp'n to Def. Steele's Mot. to Strike Ex. Submitted by Pl. in Opp'n to Steele's Mot. for Summ. J.* (Docket # 93) (*Pl.'s Opp'n to Steele Mot. to Strike*). On September 7, 2010, Mr. Steele replied. *Def. Steele's Reply in Supp. of Mot. to Strike* (Docket # 107) (*Steele Reply to Mot. to Strike*).

On December 6, 2010, the Court granted OfficeMax's request to engage in Rule 56(d) discovery and, accordingly, OfficeMax submitted a supplemental opposition to Mr. Steele's summary judgment motion. *Order on Pl.'s Appl. for Additional Time for Disc. and Mot. to Supplement its Opp'n to Def. Steele's Mot. for Summ. J.* (Docket # 218) (*Disc. Order*); *Pl.'s Supplemental Opp'n to Summ. J. Mot. of Def. Steele* (Doc. # 220) (*Pl.'s Supp. Opp'n to Steele Mot.*). On December 24, 2010,

Mr. Steele replied.[2] *Def. Steele's Supplemental Reply to Pl.'s Supplemental Opp'n to Summ. J. Mot. of Def. Steele* (Docket # 228) (*Steele Supp. Summ. J. Reply*).

On November 29, 2010, the Defendants moved for sanctions under Rule 37. *Defs.' Mot. for Sanctions Pursuant to F.R.C.P. 37* (Docket # 211) (*Defs.' Sanctions Mot.*). OfficeMax responded in opposition on December 30, 2010. *Pl.'s Opp'n to Defs.' Mot. for Sanctions Pursuant to F.R.C.P. 37* (Docket # 231) (*Pl.'s Sanctions Opp'n*). The Defendants replied. *Defs.' Reply in Further Support of Defs.' Mot. for Sanctions Pursuant to F.R.C.P. 37* (Docket # 237).

### 3. Plaintiff's Motions for Summary Judgment and to Exclude

On August 13, 2010, OfficeMax moved for summary judgment on Mr. Steele's counterclaims. *Pl.'s Mot. for Summ. J. on Countercls. of Def. John Steele* (Docket # 122) (*Pl.'s Steele Summ. J. Mot.*). On October 29, 2010, Mr. Steele filed an opposition and on November 17, 2010, OfficeMax replied. *Opp'n of Def. John Steele to Pl.'s Mot. for Summ. J. on Countercls.* (Docket # 172) (*Steele Summ. J. Opp'n*); *Pl.'s Reply to Def. Steele's Opp'n to Pl.'s Mot. for Summ. J. on Countercls.* (Docket # 186) (*Pl.'s Steele Summ. J. Reply*).

On September 13, 2010, OfficeMax moved for partial summary judgment against Messrs. Johnson and Sousa on Counts I and II of its Complaint and on Counts I and II of their counterclaims, and on October 29, 2010, it refiled a revised

---

[2] In its order allowing OfficeMax to submit supplemental opposition memoranda, the Court similarly allowed the Defendants to file a supplemental reply to OfficeMax's supplemental opposition. *Disc. Order* at 2. Because OfficeMax filed a supplemental opposition only in response to Mr. Steele's motion for summary judgment, not to Messrs. Johnson and Sousa's motion, only Mr. Steele filed a supplemental reply.

motion.[3]  *Mot. by Pl. for Partial Summ. J. Against Defs. Sousa and Johnson as to Counts One and Two* (Docket # 125); *Mot. by Pl. for Partial Summ. J. Against Defs. Sousa and Johnson as to Counts I and II of the Compl. and Counts I and II of Defs.' Countercls.* (Docket # 197) (*Pl.'s Sousa and Johnson Summ. J. Mot.*).  On October 28, 2010, Messrs. Sousa and Johnson each filed an opposition and on December 6, 2010, OfficeMax filed a consolidated reply.  *Opp'n of Def. Denis Sousa to Pl.'s Mot. for Summ. J.* (Docket # 161) (*Sousa Summ. J. Opp'n*); *Opp'n of Def. George Johnson to Pl.'s Mot. for Summ. J.* (Docket # 166) (*Johnson Summ. J. Opp'n*); *Pl.'s Reply to the Opp'ns of Def. Sousa and Def. Johnson to Pl.'s Mot. for Partial Summ. J.* (Docket # 200) (*Pl.'s Sousa and Johnson Summ. J. Reply*).

On December 24, 2010, OfficeMax moved to exclude two affidavits by Edmund Gagne and their attached exhibits, which Messrs. Sousa and Johnson had submitted in support of their opposition to OfficeMax's motion for partial summary judgment.  *Pl.'s Mot. to Exclude Defs.' Ex. A (Docket Nos. 164, 164-1, and 164-2) and Rider Decl. Ex. F (Docket No. 165-9) from the R. in Relation to Pl.'s Mot. for Partial Summ. J. Against Defs. Sousa and Johnson* (Docket # 208) (*Pl.'s Mot. to Exclude*).  On November 30, 2010, Messrs. Sousa and Johnson opposed OfficeMax's motion to exclude the Gagne declarations.  *Defs.' Opp'n to OfficeMax's Mot. to Exclude Gagne Decl.* (Docket # 213) (*Defs.' Opp'n to Mot. to Exclude*).  On December 6, 2010, OfficeMax replied.  *Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. to Exclude* (Docket # 223) (*Pl.'s Reply Mot. to Exclude*).

---

[3] OfficeMax refiled the motion in its current form after the Court granted its unopposed motion to refile a revised motion. *Pl.'s Unopposed Request for Filing of Revised Mot. for Partial Summ. J. Against Defs. Sousa and Johnson* (Docket # 159); *Order* (Docket # 169).

### B. George Johnson and Denis Sousa

From 1972 through October 9, 2009, Denis Sousa worked for OfficeMax, BCOP, or their predecessors. *Statement of Material Facts in Supp. of the Mot. of Defs. Denis Sousa and George Johnson for Summ. J.* ¶ 1 (Docket # 48) (Sousa and Johnson SMF); *Pl.'s Resp. to Defs. Sousa and Johnson's Statement of Material Facts* ¶ 1 (Docket # 65) (Resp. to Sousa and Johnson SMF). On November 16, 2001, Mr. Sousa signed an agreement (the Sousa BCOP Agreement) with BCOP. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 4 at 2 (*Sousa BCOP Agreement*).

Likewise, from 1996 through October 13, 2009, George Johnson worked for OfficeMax, BCOP, or their predecessors. Sousa and Johnson SMF ¶ 10; Resp. to Sousa and Johnson SMF ¶ 10. On February 5, 1999, Mr. Johnson signed a Noncompetition Agreement with BCOP (the Johnson BCOP Agreement).[4] *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 6 at 2 (*Johnson BCOP Agreement*).

In October 2009, "as part of a corporate reorganization plan," OfficeMax terminated Messrs. Sousa and Johnson's employment. Sousa and Johnson SMF ¶¶ 2, 11; Resp. to Sousa and Johnson SMF ¶¶ 2, 11. After the termination, in exchange for severance pay—39 weeks for Mr. Sousa and 26 weeks for Mr. Johnson—they each executed agreements with OfficeMax entitled "WAIVER OF CLAIMS AND GENERAL RELEASE" (respectively, the "Sousa Release" and the "Johnson Release"). Sousa and Johnson SMF ¶¶ 3, 12; Resp. to Sousa and Johnson

---

[4] OfficeMax made a qualified objection to Sousa and Johnson's "characterization of the territorial restriction," in the noncompetition provision, but admitted "that this provision of the agreement in question contains a territorial restriction." Resp. to Sousa and Johnson SMF ¶ 16.

SMF ¶¶ 3, 12. Messrs. Sousa and Johnson further agreed to "refrain from soliciting 'customers or prospective customers on which [they] called for OfficeMax for the purpose of selling or distributing products or services similar to or competitive with those sold or distributed by OfficeMax.'" Sousa and Johnson SMF ¶¶ 5, 12; Resp. to Sousa and Johnson SMF ¶¶ 5, 12.

The duration of the prohibition on solicitation remains in dispute. Messrs. Sousa and Johnson maintain that, pursuant to their General Releases, the restriction "lasted only so long as OfficeMax paid [them] severance," 39 weeks for Sousa and 26 weeks for Johnson. Sousa and Johnson SMF ¶ 5; *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 5 at 1 (*Sousa Release*); *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 7 at 1 (*Johnson Release*). OfficeMax asserts that these two Defendants remain subject to the 12 month noncompetition provision in their BCOP Agreements by virtue of paragraph 4.c of the General Release, which states that "[t]his Paragraph 4.c shall in no way restrict or limit other agreements between Associate and OfficeMax relating to non-competition and/or non-solicitation of customers." Sousa and Johnson SMF ¶¶ 8, 15; Resp. to Sousa and Johnson SMF ¶¶ 5, 8, 12, 15. In other termination agreements, OfficeMax has inserted a variation of the language in Paragraph 4.c, adding two final sentences:

> This Paragraph 4.c shall in no way restrict or limit other agreements between Associate and OfficeMax relating to non-competition and/or non-solicitation of customers. <u>In exchange for the consideration provided in this Agreement, Associate reaffirms his/her obligations under any prior agreement relating to noncompetition and/or non-</u>

<u>solicitation of OfficeMax customers; Associate agrees to abide by any
such agreement.</u>

Sousa and Johnson SMF ¶ 19; Resp. to Sousa and Johnson SMF ¶ 19 (emphasis in

statements of fact).

### C.    John Steele

BCOP hired John Steele in 1992.    *Statement of Material Facts in Supp. of

Def. John Steele's Mot. for Summ. J.* ¶¶ 1, 2 (Docket # 51) (Steele SMF); *Pl.'s Resp.

to Def. Steele's Statement of Material Facts* ¶¶ 1, 2 (Docket # 61) (Resp. to Steele

SMF).    After he was hired, Mr. Steele signed an agreement with BCOP entitled

"Confidential Information and Noncompetitive Agreement" (Steele BCOP

Agreement).    Steele SMF ¶ 2; Resp. to Steele SMF ¶ 2.    The Steele BCOP

Agreement included "Attachment A," which listed "ACCOUNTS EXEMPT FROM

NONCOMPETITION CLAUSE."    Steele SMF ¶ 3; Resp. to Steele SMF ¶ 3; *Pl.'s

Opp'n to Steele Mot.* Attach. 10 (*Steele BCOP Agreement*).    Mr. Steele later became

employed by OfficeMax.[5]    Steele SMF ¶ 4; Resp. to Steele SMF ¶ 4.

Some time before November 12, 2009, OfficeMax told Mr. Steele and other

sales persons that "some sales positions were being eliminated and that he could

apply for continued employment . . . [and] that he would be offered continued

employment."    Steele SMF ¶ 6; Resp. to Steele SMF ¶ 6.    OfficeMax offered

employment to Mr. Steele on November 23, 2009.    Steele SMF ¶ 6; Resp. to Steele

SMF ¶ 6.

---

[5] OfficeMax objected to Mr. Steele's material fact number 4 to the extent that it implies that his
"course of employment with OfficeMax was ever distinct from his employment with [BCOP]."    The
Court accepts OfficeMax's qualified objection and, for purposes of analyzing Steele's summary
judgment motion, does not distinguish between Mr. Steele's employment at BCOP and at OfficeMax.

On the same day, Mr. Steele's employment with OfficeMax ended.[6] [7]  Steele SMF ¶ 6, Resp. to Steele SMF ¶ 6.  On that day, Mr. Steele called some of his OfficeMax customers and "left his laptop computer, Blackberry, ID badge and a portfolio of his notes in his desk at OfficeMax's offices."  Steele SMF ¶¶ 7, 25; Resp. to Steele SMF ¶ 7, 25.  Mr. Steele claims also to have "collected and returned to OfficeMax all property belonging to OfficeMax and all documents and information he had relating to OfficeMax or its customers," including approximately twenty-four boxes of materials, except for his performance evaluations and related papers.  Steele SMF ¶¶ 8, 9; Resp. to Steele SMF ¶¶ 8, 9.  However, OfficeMax alleges that Steele did not return "two flash drives that he had connected to his laptop computer."  Resp. to Steele SMF ¶ 8; *Pl.'s Opp'n to Steele Mot.* Attach. 2 at 5 (*Pl.'s Interrog. Resp.*).  Also in dispute is whether Mr. Steele returned a list of customers he printed prior to his resignation from OfficeMax.  Resp. to Steele SMF ¶ 8; *Pl.'s Interrog. Resp.* at 5.  Mr. Steele claims to have returned the list "no later than November 30 or December 1, 2009."[8]  Steele SMF ¶ 10, Resp. to Steele SMF ¶ 10.  None of the customers that Mr. Steele called on his final day at OfficeMax has

---

[6] Mr. Steele apparently did not resign on November 23, but rather the following morning he sent a facsimile document to OfficeMax before 8 a.m. announcing his resignation.  *Pl.'s Opp'n to Steele Mot.* at 12; *Mot. for Prelim. Inj.* Attach. 10 (*Letter from Stephen W. Rider, Esq.*).

[7] The proper characterization of Mr. Steele's departure remains disputed.  Mr. Steele views his departure as a layoff stemming from his decision to "decline" the position, *Steele* SMF ¶ 6, while OfficeMax says Mr. Steele quit, *Resp. to Steele* SMF ¶ 6.  For purposes of assessing Mr. Steele's summary judgment motion, the Court accepts that he quit his OfficeMax position.

[8] OfficeMax has admitted that "a comparable version" of the customer list was returned, but cannot determine whether the returned list was the original or a copy.  Resp. to Steele SMF ¶ 10.  For purposes of assessing Mr. Steele's summary judgment motion, viewing all facts in the light most favorable to the non-moving party, the Court regards Mr. Steele as having returned a list, but not the original list.

"completely stopped" buying OfficeMax supplies and products. Steele SMF ¶ 27, Resp. to Steele SMF ¶ 27.

## II.    DISCUSSION

### A.    Motions to Strike or Exclude

The Court considers the dueling motions to strike or exclude.

#### 1.    John Steele's Motion to Strike Norway Savings Bank Document

John Steele moved to strike OfficeMax's Exhibit F, filed in support of its opposition to his summary judgment motion. *Steele Mot. to Strike* at 1. Exhibit F is a July 14, 2010 Account Sales Summary for Norway Savings Bank (Norway), showing OfficeMax's sales to Norway for 2009 and January – July 2010. *Id.*; *Norway Account Sales Summary* (Docket # 60). On March 18, 2009, Mr. Steele formally requested that OfficeMax produce documents that show the identity of Mr. Steele's Assigned Customers, OfficeMax's total sales to those customers from the two-year period before his termination through the date of its production of documents, and the details of each such sale from his termination through the date of the production. *Steele Mot. to Strike* at 2–3. OfficeMax objected to the production of these documents on the ground that the requests were overly broad, unduly burdensome, and that they sought information "that is not relevant for discovery." *Id.* Yet OfficeMax voluntarily agreed to produce "documents reflecting total sales to the customers whom Steele serviced for OfficeMax on an annual basis for 2008-2009."

Mr. Steele argues that OfficeMax refused to produce the Norway document and others like it in compliance with his Document Request Nos. 28(d)[9] and (e)[10] based upon relevancy objections, but then produced the document when it deemed the information useful to oppose summary judgment. *Id.* at 3. OfficeMax acknowledges its duty to supplement discovery responses but claims that its failure to produce the document was at most harmless error, that it would have eventually produced it, and that in any event, Mr. Steele suffered no prejudice. *Pl.'s Opp'n to Steele Mot. to Strike* at 2–3. On September 7, 2010, Mr. Steele replied. *Def. Steele's Reply in Support of Mot. to Strike* (Docket # 107).

---

[9] Mr. Steele's Request 28(d) and OfficeMax's response reads:

> Documents sufficient to show the identity of Steele's Assigned Customers and, with respect to each such customer, documents sufficient to show the following:
>
> > d) The total sales, by month, to each such customer for the two-year period prior to Steele's resignation from OfficeMax and for the period after his resignation through to the date of your production of documents;
>
> Response: OfficeMax objects to Request No. 28(d) because it is overly broad, seeks information that is not relevant for discovery, and is unduly burdensome. Subject to and without waiving its stated objections, OfficeMax will produce documents reflecting total sales to the customers whom Steele serviced for OfficeMax on an annual basis for 2008 – 2009.

*Steele Mot. to Strike* at 2.

[10] Mr. Steele's Request 28(e) and OfficeMax's response reads:

> Documents sufficient to show the identity of Steele's Assigned Customers and, with respect to each such customer, documents sufficient to show the following:
>
> > e) OfficeMax's sales to each such customer since the date of Steele's resignation from OfficeMax, including the type of items sold, the quantities of each item sold, the date of each sale and the revenue generated on each sale;
>
> Response: OfficeMax objects to Request No. 43(e) because it is overly broad, seeks information that is not relevant for discovery, and is unduly burdensome.

*Steele Mot. to Strike* at 2–3. OfficeMax responded to Request 28(e) by labeling it (c) and in the body of its Response, by referring to Request 28(e) as Request 48(e). *Id.* The Court assumes these were typographical errors.

The Court takes a dim view of OfficeMax's cagey responses to Mr. Steele's Request for Production of Documents 28. In its Complaint, OfficeMax alleged that Mr. Steele had violated the terms of the NonDisclosure and NonCompetition Agreement by soliciting OfficeMax customers during the twelve month period following his termination of OfficeMax employment, which it said was November 23, 2009. *Compl.* at 20–21. It sought actual damages against Mr. Steele. *Id.* at 21. OfficeMax's continued sales to the Mr. Steele's customers are manifestly "relevant to" both OfficeMax's claims and Mr. Steele's defenses. FED. R. CIV. P. 26(b)(1). The Court views OfficeMax's responses to the requests for production of documents as frivolous and bordering on bad faith. The Court is skeptical about OfficeMax's contentions that disclosure of this type of one-page document would have been "burdensome" and that the request was "overly broad". These objections are belied by the fact that OfficeMax readily filed the document in support of its own motion. More troubling is OfficeMax's time-limited disclosure of responsive documents only through December 31, 2009. The Court has little confidence that, if OfficeMax had not later viewed the production of post-2009 documents as advantageous, it would have voluntarily produced documents like the July 14, 2010 Norway document.

The Court finds OfficeMax's conduct particularly egregious in view of its track record on discovery in this case. After July 15, 2010, Magistrate Judge Kravchuk was required to issue two separate orders directing production of documents by OfficeMax, and to intervene in a third dispute about the parties' adherence to the confidentiality order. *Report of Telephone Conference and Order*

(Docket # 92); *Report of Telephone Conference and Order* (Docket # 101); *Order* (Docket # 196). Furthermore, OfficeMax voluntarily disclosed the Account Sales Summary only when it thought it was to its advantage.[11]

Nonetheless, the Norway document was dated July 14, 2010 and OfficeMax filed it the day after it was created. At that time, discovery had not yet closed and Mr. Steele had not sought to compel production from OfficeMax. It is therefore difficult to conclude that Mr. Steele has suffered any actual prejudice from the delayed production. *See Steele Reply to Mot. to Strike* at 2 (acknowledging that OfficeMax "produce[ed] the same data for Steele's customers other than Norway Savings Bank [on] August 31"). Accordingly, the Court denies John Steele's request to strike Exhibit F.

## 2. The Defendants' Motion for Sanctions

Pointing to OfficeMax's actions with the Norway document and its alleged failure to respond to the Defendants' discovery requests, the Defendants demand that the OfficeMax Complaint be dismissed. *Defs.' Sanctions Mot.* at 1. OfficeMax responded contesting most of the Defendants' allegations and protesting its compliance with the rules and orders of discovery. *Pl.'s Sanctions Opp'n* at 1–2. The Court dismisses the Defendants' motion without prejudice. In fairness to the parties, the Court is not in a good position to select between countervailing charges of deliberate non-compliance and protestations of innocence.

---

[11] OfficeMax filed the document under seal in support of its motion for summary judgment and Mr. Steele's counsel says that OfficeMax did not produce the document to her until she demanded a copy. *Steele Mot. to Strike* at 3.

From the record, however, the Court is concerned that OfficeMax has not been fully complying with its discovery obligations and it warns OfficeMax counsel against any recurrence of what the Court views as the sharp practice of law. Because this conduct is inconsistent with the Court's prior exposure to OfficeMax counsel, the Court will extend them the benefit of the doubt this time, but the Court reminds OfficeMax counsel that discovery in a civil case is a serious business with serious repercussions for the parties. The object is to disclose relevant documents so that the truth will come out and justice will be done, not to hide legitimately discoverable documents under the guise of legal objections in an effort to gain an unfair strategic advantage.

As this matter progresses to trial, the Defendants are free to reinitiate their motion for sanctions and the Court will reexamine any instances of past non-compliance and any additional evidence of non-compliance that has taken place and will fashion an appropriate remedy.

### 3.    OfficeMax's Motion to Exclude Gagne Declarations

OfficeMax challenges Mr. Sousa's submission of two affidavits and their attached exhibits by Edmund Gagne, the state of Maine Sales Manager for W.B. Mason, to support his opposition to OfficeMax's partial summary judgment motion against him. An explanation of the significance of Mr. Sousa's reliance upon the affidavits is in order. OfficeMax's partial summary judgment motion against Sousa asserts that Mr. Sousa "now concedes that he retained two computer flash drives containing information belonging to OfficeMax for months after his termination of

employment." *Pl.'s Sousa and Johnson Summ. J. Mot.* at 6–8. In his opposition, Mr. Sousa attacked the business justification for any noncompetition or nondisclosure agreement, saying that customer goodwill is not a major factor in the office products business and there are no real trade secrets. *Sousa Summ. J. Opp'n* at 6. To support this claim, Mr. Sousa attached an October 28, 2010 affidavit from Mr. Gagne, which referred to an attached multi-page document entitled "Vision 2000." *Decl. of Edmund Gagne in Opp'n to Pl.'s Mot. for Summ. J.* (Docket # 164) (*Gagne Oct. 28, 2010 Decl.*) Attachs. 1, 2 (*Vision 2000 Study*).

In addition, Mr. Sousa attached an affidavit from defense counsel Stephen Rider, addressing OfficeMax's claim that Mr. Sousa had failed or refused to turn over the original OfficeMax flash drives. *Decl. of Stephen W. Rider with Respect to Pl.'s Mot. for Summ. J. Against Sousa and Johnson* (Docket # 165). Mr. Rider attached as an exhibit to his declaration the second Gagne declaration at issue. *Id.* Attach. 9 (*Gagne June 30, 2008, Decl.*). This affidavit was dated June 30, 2008 and was filed in a Cumberland County Superior Court case, *OfficeMax, Inc. v. W.B. Mason Co., Inc.*, Docket # 08-311. *Id.* Mr. Sousa refers to the June 30, 2008 Gagne affidavit to demonstrate that OfficeMax knew from prior litigation that W.B. Mason required transferring employees not to bring any documents or information from their old employers, specifically OfficeMax. *Sousa Summ. J. Opp'n* at 20. When OfficeMax filed suit against Mr. Sousa, it mailed a copy of the Complaint to W.B. Mason's CEO, containing the allegation that, contrary to what OfficeMax knew was W.B. Mason policy, Mr. Sousa had retained confidential OfficeMax information. *Id.*

Mr. Sousa says that by sending W.B. Mason's CEO a copy of the Complaint, OfficeMax was attempting to encourage W.B. Mason to fire Mr. Sousa for what OfficeMax knew W.B. Mason would consider a firing offense. *Id.* This, in Mr. Sousa's view, amounted to abuse of process. *Id.*

Turning to OfficeMax's Motion to Exclude the June 30, 2010 Gagne Affidavit, OfficeMax's first point in favor of exclusion is that the Gagne Affidavit is not dated June 30, 2010, as Mr. Sousa claims, because it is identical to a Gagne Affidavit dated June 30, 2008, which had been filed in the prior Cumberland County Superior Court litigation involving OfficeMax. *Pl.'s Mot. to Exclude* at 2. Second, OfficeMax says that Mr. Sousa failed to produce the Gagne declaration in response to discovery that should have elicited its revelation. *Id.* at 2–3. Third, OfficeMax says that Mr. Gagne's opinions are expert opinions and Mr. Sousa has never designated Mr. Gagne as an expert witness. *Id.* at 3–5. Fourth, OfficeMax contends that Mr. Gagne's statements contain an "extensive amount of inadmissible hearsay" and otherwise fail to comply with the personal knowledge requirement of Rule 56(f). *Id.* at 6.

In opposing exclusion of the June 30, 2010 affidavit, the Defendants first describe the earlier OfficeMax litigation that led to the filing of the June 30, 2008, Gagne declaration. *Defs.' Opp'n to Mot. to Exclude* at 1–4. They then address OfficeMax's contention that Mr. Gagne's opinions are expert opinions, asserting that his opinions are not expert opinions but rather lay witness opinions under

Federal Rule of Evidence 701. *Id.* at 5–8. Finally, the Defendants say that the June 30, 2010 Gagne declaration:

> is submitted only for a very limited purpose, *i.e.*, to show that, when OfficeMax sent its letter with a copy of its <u>Complaint</u> in this action to W.B. Mason's CEO, OfficeMax was on notice that this might lead to the Defendants' firing. Specifically, Mr. Gagne's 2008 Affidavit informed OfficeMax that W.B. Mason required new employees like Sousa, Johnson and Steele to confirm, as a condition of their employment, that they had returned to their former employer all property and other materials concerning the former employer's business or customers. The <u>Complaint</u> OfficeMax sent to W.B. Mason's CEO, however, alleged (falsely) that the Defendants had violated these instructions. Defendants argue that this evidence demonstrates OfficeMax's bad faith motive for purposes of the Defendants' abuse of process counterclaims.

*Id.* at 8–9. Regarding their failure to produce the June 30, 2008 Gagne declaration, the Defendants observe that OfficeMax already had it, and in any event, OfficeMax cannot claim any prejudice. *Id.* at 9–10.

In reply, OfficeMax says that the Defendants have not cited any authority to allow Mr. Gagne to present such "incredibly broad, wholly conclusory types of statements." *Pl.'s Reply Mot. to Exclude* at 1. OfficeMax reiterates that the Court should reject the Gagne declaration insofar as it contains undesignated expert testimony and should reject the declaration insofar as it contains irrelevant lay testimony. *Id.* at 2–3. OfficeMax repeats its contention that the Court should reject the Gagne declaration because the Defendants' failed to produce it in discovery. *Id.* at 4.

In seeking to exclude the June 30, 2008 Gagne declaration, OfficeMax is demanding a Rule 37(c) exclusion sanction. FED. R. CIV. P. 37(c). The context of

this potential exclusion is significant since in his counterclaim, Mr. Sousa's abuse of process counterclaim is premised on OfficeMax's alleged knowledge of W.B. Mason's employment policy and the possibility that W.B. Mason would fire Mr. Sousa for violating its policy. Thus, the exclusion of the Gagne declaration could amount to the dismissal of his abuse of process claim.

In these circumstances, the First Circuit has cautioned against preclusion when it would carry "the force of a dismissal" and has said that the justification for preclusion "must be comparatively more robust." *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 79 (1st Cir. 2009). Before preclusion in these circumstances, the Court must review:

> a "host of factors, including: (1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects—e.g. the surprise and prejudice associated with the late disclosure; and (5) the late disclosure's impact on the district court's docket.

*Id.* at 78. Considering the circumstances here, the Court easily concludes that exclusion of the June 30, 3008 Gagne affidavit is not appropriate under *Esposito*. In spite of Mr. Sousa's weak explanation for his failure to disclose his intended use of the June 30, 2008 Gagne declaration, there are three countervailing factors: 1) OfficeMax's previous awareness of the June 30, 2008 Gagne declaration, 2) the lack of any actual prejudice to OfficeMax, and 3) the lack of an appreciable impact on the Court's docket.

The October 28, 2010 Gagne declaration (Exhibit A) raises a different issue. Messrs. Johnson and Sousa did not designate Edmund Gagne as an expert witness

and they contend that they are not submitting his October 28, 2010 declaration as expert testimony but purely as Rule 701 lay testimony. *Defs.' Gagne Opp'n* at 5–8. OfficeMax disagrees. *OfficeMax Gagne Reply* at 2–4. The Court concludes that some of the Gagne declaration is expert testimony and some is not. The "line between expert testimony under Federal Rule of Evidence 702 . . . and lay opinion testimony under Federal Rule of Evidence 701 . . . is not an easy one to draw." *United States v. Ayala-Pizarro*, 407 F.3d 25, 28 (1st Cir. 2005) (quoting *United States v. Colon-Osario*, 360 F.3d 48, 52–53 (1st Cir. 2004)).

In his October 28, 2010 declaration, Mr. Gagne asserts that W.B. Mason "does not require its sales representatives or managers to sign non-competition agreements." *Gagne Oct. 28, 2010 Decl.* ¶ 4. He explains that the office supply business is a "commodity business" and that customers are concerned with "only three things – price, prompt and accurate deliveries, and customer service." *Id.* ¶ 7. He further says that "[b]ased upon my over 25 years experience, I have learned that there is little or no customer loyalty or goodwill in the office products supply industry." *Id.* ¶15. Mr. Gagne cites a 2000 study by United Stationers called "Vision 2000," which arguably confirms that "customers care principally about price and service, and there is little or no customer goodwill." *Id.* ¶¶ 16–17. Mr. Gagne also states that W.B. Mason does not use customer lists and instead prefers the "cold call" method, walking down the street and calling on "every business – street by street, building by building and office by office." *Id.* ¶ 18.

Even if Mr. Gagne correctly describes W.B. Mason's business model, the Court is dubious that Mr. Gagne's experience can be extrapolated to the office supply business as a whole and to OfficeMax in particular. There is no evidence in this record, for example, that OfficeMax has adopted a "cold call" sales model and devalues longstanding customer-salesperson relations. Moreover, the further Mr. Gagne strays from his personal experience as a W.B. Mason salesperson to more generalized opinions about the office supply industry and how OfficeMax must operate its business, the more he sounds like an expert. Having carefully reviewed the October 28, 2010 Gagne declaration and the supporting documents, the Court rejects the portion of the declaration that is not based on his personal knowledge, including those portions based upon the Vision 2000 study. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

The Court denies OfficeMax's motion to exclude in part and grants it in part. It denies the motion regarding the June 30, 2008 Gagne declaration and grants the motion regarding the October 28, 2010 Gagne declaration, but only insofar as it contains expert opinions not based on Mr. Gagne's personal knowledge.

## B.    Summary Judgment Standard[12]

A party moving for summary judgment is entitled to judgment in its favor only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if its resolution "might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir. 2004)). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Seaboard Sur. Co.*, 370 F.3d at 218–19).

Once this evidence is supplied by the moving party, "the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993). However, the nonmoving party cannot meet its burden with "conclusory allegations, improbable inferences, and unsupported speculation." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)); *accord Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir. 2009). Rather, it must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir. 2009)

---

[12] On December 1, 2010, while this motion was pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. *See Farmers Ins. Exch. v. RNK, Inc.*, No. 09-2524. 2011 U.S. App. LEXIS 1255 *8 n.4 (1st Cir. Jan. 21, 2011). Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens." *Id.*

(quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993) (internal quotation marks omitted). The Court is then tasked with reading the record "in the light most favorable to the non-moving party, drawing all reasonable inferences in [the non-movant's] favor." *Merchs. Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998).

### C. Defendants' Motions for Summary Judgment

#### 1. Effect of Termination on the Enforceability of the BCOP Agreement's Noncompetition Provision

In their summary judgment motions, the Defendants all put forth the policy-based argument that "a termination without cause renders a prior noncompete unenforceable." *Sousa and Johnson Summ. J. Mot.* at 5; *Steele Summ. J. Mot.* at 8. In support, the Defendants refer to an article by Attorney Kenneth J. Vanko in the DePaul Business & Commercial Law Journal entitled "You're Fired!! And Don't Forget Your Non-Compete!," 1 DEPAUL BUS. & COM. L.J. 1 (2002), which surveys the legal landscape surrounding noncompetition agreements asserted against terminated employees. *Sousa and Johnson Summ. J. Mot.* at 5–6; *Steele Summ. J. Mot.* at 8–11.

The Defendants concede that "Maine Courts have not yet addressed this question or determined whether a termination without cause vitiates a noncompete." *Sousa and Johnson Summ. J. Mot.* at 6; *Steele Summ. J. Mot.* at 8–9. Even so, relying on the article's logic and "Maine's long hostility to such noncompetition covenants," the Defendants assert that "there can be little doubt that the Supreme Judicial Court of Maine, if presented with this question, would . .

. hold that these noncompetes are unenforceable, as a matter of law, because OfficeMax terminated [the Defendants] without cause." *Sousa and Johnson Summ. J. Mot.* at 10; *Steele Summ. J. Mot.* at 11. They urge the Court to "adopt the majority rule and hold that discharge without cause vitiates an employee's territorial noncompete." *Sousa and Johnson Summ. J. Reply* at 2; *Steele Summ. J. Mot.* at 11.

OfficeMax challenges the Defendants" attempts to have the Court adopt a *per se* rule against noncompetition agreements in instances of employer-initiated terminations. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 11–16; *Pl.'s Opp'n to Steele Mot.* at 14. In doing so, OfficeMax invokes "established rules of comity" between federal and state courts, and asserts that any attempt to create such a rule here "would constitute an unjustified expansion of state law." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 12; *Pl.'s Opp'n to Steele Mot.* at 15. Challenging the Defendants' assertion of Maine's "long hostility to noncompetition agreements," OfficeMax proceeds to detail instances where Maine courts have upheld noncompetition agreements or applied a more flexible, fact-specific standard. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 12–16; *Pl.'s Opp'n to Steele Mot.* at 15.

The Court considered these very same arguments in *OfficeMax Inc. v. County Qwick Print, Inc.*, No. CV-10-110-B-W, 2010 WL 4473306, at *21 (D. Me. Nov. 8, 2010), and ruled that "[i]n the absence of guidance from the Maine Legislature and the Maine courts, the Court cannot accurately predict what, if presented with this

question, the Maine Supreme Judicial Court would do." It concluded that the "safer approach is to consider the circumstances of [the employee's] termination as a factor in balancing the relative equities between the parties, but as a federal court, not to attempt to create a new rule of substantive state law." *Id.* Absent intervening contrary authority, the Court reiterates its earlier conclusion for the same reasons.[13] *Id.*

### 2. Effect of the Waiver of Claims and General Release on the BCOP Agreements

In their summary judgment motions, Messrs. Johnson and Sousa assert that that the general release they executed in exchange for severance pay reciprocally released them from the BCOP Agreements by OfficeMax. *Sousa and Johnson Summ. J. Mot.* at 12. Their argument partially undergirds their counterclaims for declaratory judgment to void the BCOP Agreements, and they press it again in their opposition to OfficeMax's summary judgment motion on their declaratory judgment counterclaim. *Johnson Summ. J. Opp'n* at 11–12; *Sousa Summ. J. Opp'n* at 13.

Citing "long-standing Maine law" from *Butters v. Kane*, 347 A.2d 602, 603 (Me. 1975), Messrs. Sousa and Johnson maintain that the "broad general release [in the Sousa and Johnson Release] implies a reciprocal, broad release from [OfficeMax,] absent an express reservation of rights." *Sousa and Johnson Summ. J.*

---

[13] Furthermore, even if this Court were to adopt the *per se* approach, it is not clear whether Mr. Steele would benefit. While Messrs. Sousa and Jonson were involuntarily terminated, the circumstances of Mr. Steele's departure from OfficeMax are disputed. Sousa and Johnson SMF ¶ 2; Resp. to Sousa and Johnson SMF ¶ 2; Steele SMF ¶ 6; Resp. to Steele SMF ¶ 6 (denying that Steele was "laid off," and asserting instead that Steele "quit his employment"). With dueling dispositive motions, the Court views the circumstances of Mr. Steele's departure variously in favor of the non-movant.

*Mot.* at 12. Because the Sousa and Johnson Releases lack such an express reservation, Messrs. Sousa and Johnson assert that "OfficeMax is deemed to have released all rights it had against Sousa and Johnson, including all rights under prior noncompetes" including their BCOP Agreements. *Sousa and Johnson Summ. J. Mot.* at 13.

OfficeMax attacks the argument, both in its opposition to the Defendants' summary judgment motions and in its own summary judgment motion. OfficeMax presses two points. First, it asserts that *Butters* is limited to releases of claims arising out of past events. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 18. According to OfficeMax, the Sousa and Johnson Releases fall outside *Butters'* scope because they "expressly **excluded** potential claims 'arising from events occurring **after** the date Associate signs this Agreement.'" *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 18 (emphasis in original).

Second, OfficeMax argues that, even accepting that the Sousa and Johnson General Releases fall within *Butters'* scope, the Defendants' argument still fails because "an express reservation of rights in favor of OfficeMax was included in the severance agreements relating to their continuing, post-employment obligations to OfficeMax . . . ." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 19. OfficeMax cites Paragraph 4.c of the Sousa and Johnson Releases, which states that "This Paragraph 4.c shall **in no way restrict or limit other agreements** between Associate and OfficeMax **relating to non-competition and/or non-solicitation of customers**." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 19 (emphasis

in *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.*).  OfficeMax reads this provision as "clearly preserv[ing] their continuing, contractual obligations pursuant to the other agreements [the Defendants] had signed with OfficeMax concerning the issues of non-competition and/or non-solicitation of customers.  *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 19.

Replying to OfficeMax's argument, Messrs. Sousa and Johnson assert that Paragraph 4.c of the Sousa Release and Johnson Release, contains "a drafting error on the part of OfficeMax," which limits the reach of the reservation of rights clause only to that paragraph and does not otherwise affect the broad release.  *Sousa and Johnson Summ. J. Reply* at 2–3.

The general release states, *inter alia*, that Messrs. Sousa and Johnson release OfficeMax from "all suits, causes of action, claims and demands, whether known or unknown, that Associate has or may have as of the date that Associate executes this Agreement  . . . " and includes claims of breach of contract.  *Sousa Release* at 1; *Johnson Release* at 1.  According to Messrs. Johnson and Sousa, their explicit release of claims against OfficeMax included the implicit release by OfficeMax of claims against them, including claims based upon the previous BCOP Agreement.  The Defendants' argument is an intricate one, and requires a brief review of Maine law.

In *Butters*, the Maine Law Court addressed a lawsuit that arose out of a snowmobile collision between Peter Kane and Robert Butters that caused personal injuries to Mr. Butters' wife, Beverly, who was a passenger on Mr. Butters'

snowmobile at the time of the collision. 347 A.2d at 602. Ms. Butters sued Mr. Kane, who impleaded Mr. Butters. *Id.* at 602–03. While Ms. Butters' lawsuit was pending, Mr. Kane paid Ms. Butters $25,000 in consideration, for which Mr. and Ms. Butters released Mr. Kane "from any and all claims, demand, damages, actions, causes of action or suits of any kind of nature whatsoever." *Id.* at 603. Following this settlement, Mr. Kane amended his complaint to seek judgment against Mr. Butters for the percentage of the $25,000 consistent with Mr. Butters' contributory negligence in causing the accident and Ms. Butters' injuries. *Id.* The case went to trial and a jury found that Mr. Butters was thirty percent responsible for the accident. *Id.* The Superior Court Justice, however, granted judgment notwithstanding the verdict, based on the release among the parties. *Id.* at 603–04.

On appeal, the Maine Supreme Judicial Court, citing *Norton v. Benjamin*, 220 A.2d 248 (Me. 1966), noted that it is settled law in the state of Maine that "'all causes of action' . . . include the right of contribution unless such right of action for contribution is expressly excepted from the terms of the release." *Id.* at 603. *Norton*, however, involved a mutual release and in *Butters*, Mr. Kane had not signed the release. *Id.* The Law Court reviewed case law from other jurisdictions which, based upon various principles of equity, concluded that "unless the releasee expressly reserves his right of action against the releasor, all litigation between the parties arising out of the same cause of action is terminated whether suit is pending at the time the release is given or is subsequently asserted." *Id.* at 604 (internal citation omitted). The Law Court adopted the rationale of these courts and

"declare[d] the rule in Maine to be that the making of a settlement without any express reservation of rights constitutes complete accord and satisfaction of all claims of immediate parties to the settlement arising out of the same accident." *Id.*

Since 1975, Maine courts, both state and federal, have applied *Butters*. *See, e.g., N. Am. Co. for Life and Health Ins. v. Malmstrom*, No. CIV. 00-83-B-H, 2001 WL 225014, at *2 (D. Me. March 1, 2001); *Cyr v. Cyr*, 560 A.2d 1083, 1084 (Me. 1989); *Snyder v. Legacy Farms, Inc. of Perham*, 2002 WL 32068250, No. CV-01-078, at *4 (Me. Super. Nov. 13, 2002). In *Cyr v. Cyr*, for example—also cited by the Defendants—the Law Court further explained its reasoning in *Butters*:

> Ordinary reasonable and reasoning persons occupying the position of the releasors at the time they accepted a settlement of their claim and executed the release and dismissal of their suit would think the entire matter was settled. They would not expect the releasee to pay them money in satisfaction of their claim and then sue them upon a cross-claim. No reason appears why the releasee should pay money to them when he felt *they* were actually indebted to *him.*

*Id.* (quoting *Mensing v. Sturgeon*, 97 N.W.2d 145, 151 (Iowa 1959)) (emphasis in original; internal brackets omitted). It clarified that "implicit in the bargain of accord and satisfaction is a reciprocal release, by the party who has procured the express release, of any claims inconsistent with the settlement effected by the release." *Id.*

*Butters*' reach is not unlimited, however, and later cases clarify that it does not address circumstances like this one where the parties had neither entered nor contemplated litigation when the general release was signed. In *Reed & Reed, Inc. v. Weeks Marine, Inc.*, No. 02-195-P-H, 2004 WL 256335, at *10 (D. Me. Jan. 9, 2004), this Court held that *Butters* "cannot reasonably be interpreted to apply to

releases executed in circumstances other than the settlement of litigation." The Court noted that "[t]o adopt [the opposing] view would be to import reciprocity into every release document that does not include an explicit reservation of rights by the releasee." *Id.* The reasoning in *Reed & Reed* is applicable here. The Sousa and Johnson releases did not relate to any ongoing litigation, or even the threat of litigation. Their purpose was precisely to avoid litigation by settling any and all potential disputes once the parties were freed from their employment relationship.

The facts in *Butters* further limit its precedential authority. As argued by OfficeMax, the general release in *Butters* settled disputes from a prior, clearly defined event. *See Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 18–19; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 13; *Pl.'s Sousa and Johnson Summ. J. Reply* at 12. It did not profess to resolve future, unrelated events. The Law Court emphasized this point, noting that other courts view a general release as terminating "all litigation between the parties *arising out of the same cause of action* . . . whether suit is pending at the time the release is given or is subsequently asserted." *Butters*, 347 A.2d at 604 (emphasis added). The Law Court did not explain that the general release terminated future litigation arising out of some other cause of action.

*Cyr* is distinguishable for the same reason. It involved the sale of a business and subsequent allegations of misrepresentation and breach of warranty. The sale included a release of "any claims arising out of the mortgage and notes that the buyers had given the sellers to purchase the restaurant." *Cyr*, 560 A.2d at 1084. By

its terms, the release did not cover future transgressions by the parties unrelated to the purchase of the business.

Consistent with *Cyr*, this Court starts with the language of the agreements:

> Associate does hereby release and discharge the Company from and for all suits, causes of action, claims and demands, whether known or unknown, that Associate <u>has or may have as of the date that Associate executes this Agreement</u>, including without limitation, those arising out of, or in any way related to Associate's employment with and termination of employment from the Company.

*Sousa Release* at 1 (emphasis added); *Johnson Release* at 1 (same). By their language, the Waiver of Claims and General Releases apply only to causes of action that existed up to and including the date they were executed. The events that form the gravamen of OfficeMax's Complaint had not yet taken place and, by the terms of the Releases, were not included.

The Court concludes that the general releases do not void the BCOP Agreements.

### 3. The Validity of the BCOP Agreements With Respect to Maine Public Policy

The Defendants challenge the BCOP Agreements as void as a matter of public policy. They first make this argument in their declaratory judgment counterclaims, seeking judgment that their noncompetition agreements are "void and unenforceable."[14] *Sousa Answer* at 4*; Johnson Answer* at 4; *Steele Answer* at 18. They press the point again in their opposition to OfficeMax's summary

---

[14] Mr. Steele puts his requested relief in different terms than Messrs. Sousa or Johnson, asking for judgment that he "has no contractual restrictions whatsoever on his working for W.B. Mason and/or soliciting OfficeMax customers, including those OfficeMax customers he called upon while employed by OfficeMax." *Steele Answer* at 18. The Court understands this request to be substantively the same as Messrs. Sousa and Johnson's request to declare their BCOP Agreement "void and unenforceable." *Sousa Answer* at 4; *Johnson Answer* at 4.

judgment motions. *Sousa Summ. J. Opp'n* at 13–17; *Johnson Summ. J. Opp'n* at 12–15. OfficeMax disagrees. *Pl.'s Steele Summ. J. Mot.* at 2–6, 22; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 15; *Pl.'s Sousa and Johnson Summ. J. Reply* at 6–12, 15.

Steele's BCOP Agreement provide for a one-year restriction on the sale or distribution of services or merchandise:

> For a period of 12 months after termination of my employment with [BCOP] . . . (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not . . . sell or attempt to sell any services or merchandise customarily provided by [BCOP] to any prior or current [BCOP] customer which I called on at any time as a representative of [BCOP].

*Steele BCOP Agreement* at 1. Messrs. Johnson and Sousa's BCOP Agreements contain similar prohibitions:

> For a period of 12 months after termination of my employment with [BCOP] . . . (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not . . . engage in the sale or distribution of office supplies, office furniture or related office products or services, in any geographic territories I was assigned by BCOP in the 12 months prior to my termination of employment.

*Sousa BCOP Agreement* at 1; *Johnson BCOP Agreement* at 1.

For Messrs. Johnson and Sousa, however, OfficeMax seeks more limited enforcement of the provision, asking that Messrs. Johnson and Sousa's BCOP Agreements be enforced "to the extent [they] restrain[] [Johnson and Sousa] in the initial 12 months following their termination from competing for Plaintiff's existing customers located in the geographical territories that they worked in and managed for OfficeMax during their final twelve months of employment." *Pl.'s Sousa and Johnson Summ. J. Mot.* at 2.

The Court considers the enforceability of the noncompetition provision "only as [OfficeMax] has sought to apply it and not as it might have been enforced on its terms." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). At the same time, "the party seeking enforcement cannot leave it to the court to enforce only those provisions the court deems reasonable. To do so would require the court to redraft the contract." *Everett J Prescott, Inc.*, 390 F. Supp. 2d 44, 47 (D. Me. 2005).

The scope of enforcement that OfficeMax seeks is slightly narrower than the restrictions provided by the plain text of the noncompetition clause. Yet, Messrs. Sousa and Johnson protest this effective change to the BCOP Agreements, noting that in OfficeMax's complaint and in its motion for preliminary injunction, OfficeMax sought enforcement to the full scope of the contractual language and that "this bobbing and weaving" effectively asks the court to "redraft the contract, as the evidence develops in the case." *Sousa Summ. J. Opp'n* at 15; *Johnson Summ. J. Opp'n* at 13–14.

The Court rejects this argument. The restriction OfficeMax seeks enforced is not significantly different than the restriction described in the contractual language and, consistent with *Brignull*, the Court considers the provisions of the Agreements that OfficeMax has "sought to apply and not as it might have been enforced on its terms."[15] 666 A.2d at 84.

---

[15] Mr. Steele's BCOP Agreement is both broader and narrower than Sousa and Johnson Agreements: broader in that it applies to all Mr. Steele's prior or current customers, not just those on whom he called during the last twelve months; and narrower in that it lists exempted accounts. For purposes of assessing the reasonability of the Defendants' agreements, this difference is of no consequence and the Court reviews the agreements together.

The Defendants' challenge to the validity of the noncompetition agreements is limited to their scope relative to the business interests that OfficeMax seeks to protect. Specifically, Messrs. Sousa and Johnson say that OfficeMax's stated justification is only to protect its trade secrets and customer goodwill. They counter that genuine issues of material fact remain as to whether OfficeMax had any goodwill and whether trade secrets and confidential information play a significant role in the industry. *Sousa Summ. J. Opp'n* at 14; *Johnson Summ. J. Opp'n* at 14–15. In support of their argument, Sousa and Johnson offer the Declaration of Edmund Gagne, which the Court has limited to his lay, not expert opinions.[16] *See supra* Part II.A.3. *Def. Denis Sousa's Opposing Statement of Material Facts* ¶ 56 (Docket # 162) (*Sousa* RPSMF); *Def. George Johnson's Opposing Statement of Material Facts* ¶ 52 (Docket # 167) (*Johnson* RPSMF). Mr. Gagne asserts that W.B. Mason "does not require its sales representatives or managers to sign non-competition agreements." *Gagne Decl.* ¶ 4. Mr. Gagne also states that W.B. Mason does not use customer lists and instead prefers the "cold call" method, walking down the street and calling on "every business – street by street, building by building and office by office." *Id.* ¶ 18.

In *OfficeMax v. County Qwick Print*, the Court set forth its understanding of Maine law regarding covenants not to compete:

---

[16] Because Messrs. Johnson and Sousa failed to designate Mr. Gagne as an expert witness, the Court declines to consider his observations about the office products industry as a whole and about OfficeMax in particular, including the factors that motivate office products customers, the significance of goodwill in the industry, the existence of trade secrets within the office products industry, and similar expert opinions. The Court also will not consider the "Vision 2000" Study, which is hearsay and the subject of Mr. Gagne's excluded expert opinions.

The Maine Law Court has emphasized that, because of the potential for post-employment covenants to restrict the former employee's ability to earn a living, "such covenants are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Chapman & Drake*[ v. Harrington], 545 A.2d [645,] 646–47 [(Me. 1988)] (quoting *Lord v. Lord*, 454 A.2d 830, 834 (Me. 1983) (internal quotation marks omitted)). The reasonability of a noncompetition covenant "must ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected." *Id.* at 647.

. . .

In assessing the interests that OfficeMax seeks to protect, the Court notes that "protecting the employer simply from business competition is not a legitimate business interest to be advanced by such an agreement." *Chapman & Drake*, 545 A.2d at 647. "[A] covenant not to compete may be reasonable, however, when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Id.* at 647; *see also Roy v. Bolduc*, 140 Me. 103, 103, 34 A.2d 479, 480–81 (1943) (holding unreasonable a noncompetition agreement where the employer possessed no trade secrets and had imparted no confidential information that could have been used against the employer).

2010 WL 4473306, at *21.

In view of these principles, Messrs. Johnson and Sousa are making a *Roy v. Bolduc* argument: if the employer has no trade secrets and no confidential information, and there has been no improper interference with prior customers, a restrictive covenant would violate public policy against "the rightful exercise of . . . skill and knowledge in gaining a livelihood in . . . his calling or trade." *Roy*, at 81. Messrs. Johnson and Sousa contend that because there is no such thing as goodwill

in the office supply business, any agreement not to compete on that basis is void as against public policy.

This is a factual issue. Particularly once Mr. Gagne's declaration is properly limited to lay testimony, there is little in the record that would justify a conclusion as a matter of law that OfficeMax has no goodwill or trade secrets to protect. The plain text of the Sousa and Johnson BCOP Agreements stipulates otherwise:

> In agreeing to this restriction, I specifically acknowledge the substantial value to BCOP of my customer contracts and agree that such contacts constitute goodwill and a protectable interest of BCOP.

*Pl.'s Sousa and Johnson Summ. J. Reply* at 9. Under Maine law, it is OfficeMax's burden to demonstrate the necessity and reasonableness of the restrictive covenants and that the restrictions "sweep no wider than necessary to protect the business interests in issue." *Chapman & Drake*, 545 A.2d at 646–47. However, the reasonableness of a noncompetition covenant "must ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected." *Id.* at 647. The fact-based application of this legal standard makes summary judgment inappropriate for any of the Defendants on this issue.

### 4. Applicability of the Noncompetition Provision in Johnson's BCOP Agreement

As regards George Johnson only, Mr. Johnson argues that his BCOP Agreement, "by its own, express terms" is enforceable only "when the termination results from something done by Johnson, and does not apply to a situation where OfficeMax terminates Johnson without cause." *Sousa and Johnson Summ. J. Mot.*

at 10. According to Mr. Johnson, the unique language of his BCOP Agreement limits the applicability of that noncompetition clause to situations where he either leaves voluntarily or is terminated for cause:

> For a period of 12 months after termination of my employment with BCOP, whether such termination is voluntary or involuntary on my part . . . .

*Johnson BCOP Agreement* at 1. Specifically, the parties dispute the meaning of "involuntary <u>on my part</u>," which is not present in the later-signed Sousa BCOP Agreement. *See Sousa BCOP Agreement* at 1.

Mr. Johnson argues that the term cannot be surplusage and must have meaning. He concludes that the only logical interpretation is that the noncompete applies only "when the termination results from something done by Johnson." *Sousa and Johnson Summ. J. Mot.* at 10. He reasons that because his termination was not the product of his own actions, it was not covered by his BCOP Agreement. *Id.* at 11. Furthermore, Mr. Johnson argues that "[t]o the extent there is any ambiguity in this clause, the clause must be construed against OfficeMax, both because it drafted the agreement, and because noncompetition agreements are customarily interpreted strictly against the employer . . . ." *Sousa and Johnson Summ. J. Mot.* at 11.

OfficeMax replies that Mr. Johnson is reading into the contract "hypothetical scenarios," and reading out of the contract "the vital nature of the interests that OfficeMax is reasonably attempting to protect through the larger sentence at issue and the noncompetition clause itself." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 17. OfficeMax reasons that the broader protections granted by the "larger

part of the sentence"—protecting OfficeMax from any departure by Johnson—should not be abridged by the "subordinate phrase." *Id.* at 17–18.

*"The summary judgment analysis for a breach of contract case depends upon the nature of the contract language; where the language is unambiguous, contract interpretation is a question of law for the court, where ambiguous, it is a question of fact for the jury."* Tate & Lyle Ingredients Ams., Inc. v. Trans. Dist., LLC., CV-1-120-B-W, 2010 U.S. Dist. LEXIS 112415, at *15–16 (D. Me. Oct. 21, 2010) (citing FHS Props. Ltd. P'ship. v. BC Assocs., 175 F.3d 81, 87 n.7 (1st Cir. 1999)). *The initial determination of ambiguity is a question of law for the court.* United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995). "[C]ontract language is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 586 (1st Cir. 1993). *That is, a term is ambiguous if it can be reasonably understood at least two ways.* Coastal Ventures v. Alsham Plaza, LLC, 2010 ME 63, ¶ 26, 1 A.3d 416, 424.

Here, the Court readily concludes that the language is ambiguous. The first part of the sentence describes the triggering event for the running of the twelve month period, namely "termination." The second part of the sentence clarifies that the provision applies whether it is "voluntary or involuntary termination on my part." "Voluntary on my part" presumably means that the noncompete agreement applies if Mr. Johnson quits. "Involuntary on my part" seems purely redundant

since if it is involuntary, it must be involuntary on someone's part, namely the person against whom the action is being taken.

The parties have reached for explanations of the phrase. One possibility is that the phrase refers to termination for cause, which would, by definition, be involuntary on the employee's part. At oral argument, Mr. Johnson's lawyer suggested that the phrase could also refer to a situation where Mr. Johnson's employment is terminated should he become disabled and unable to work. Conversely, if OfficeMax became economically required to terminate Mr. Johnson— as happened here—then under this interpretation, the termination might fall outside the agreement because Mr. Johnson would have had no control over his layoff. In other words, if OfficeMax terminated Mr. Johnson involuntarily, not "on [the] part" of Mr. Johnson, OfficeMax could not hold him to the noncompetition provisions.

Assuming the words—involuntary on my part—refer to OfficeMax firing Mr. Johnson, then consistent with this view, it is possible that the words "on my part" are superfluous and that the entire phrase was intended to clarify that it covered voluntary, i.e. quit, terminations as well as involuntary, i.e. fired, terminations. *But see Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 9, 983 A.2d 400, 403 (courts should strive to "avoid any interpretation that renders a provision meaningless"); *Ackerman v. Yates*, 2004 ME 56, ¶ 10, 847 A.2d 418, 422 (same); *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 12, 814 A.2d 989, 993 (same); *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004) ("[A]n inquiring court should, whenever

possible, avoid an interpretation that renders a particular word, clause, or phrase meaningless or relegates it to the category of mere surplusage"). Faced with two compelling constructions of the phrase "involuntary on my part," the Court concludes that there is an ambiguity inherent in the contract.

Even if a contract is ambiguous, when there are no facts in dispute, the interpretation of a contract is a question of law for the court. *See FHS Props. Ltd. P'ship*, 175 F.3d at 87 n.7; *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 992 (1st Cir. 1992) (when there are no facts in dispute, the court must interpret the words of a contract as a matter of law). At the same time, "[w]here there is an ambiguity in a written contract, and the record does not completely eliminate the possibility of an issue of material fact concerning the intent of the parties, summary judgment is inappropriate". *Tondreau v. Sherwin-Williams*, 638 A.2d 728, 730 (Me. 1994). When a contract is found to be ambiguous, a court "may look to extrinsic evidence of the intent of the parties." *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457, 461. Here, Mr. Johnson forcefully argues that there are no disputed facts that would clarify the parties' intent. He notes that the parties have not located the person who drafted the Johnson contract for BCOP and there is no evidence that would assist a fact-finder in divining intent.

Although the question is a close one, the Court is leery of drawing the conclusion on a contested summary judgment record that no extrinsic evidence would assist a factfinder. For example, there is evidence that the same clause in the later Sousa BCOP Agreement does not contain the "on my part" phrase but

contains otherwise identical language. A fact finder could find that fact significant or not. Similarly, the context of this agreement, the nature of the office products industry, and the circumstances of BCOP and Johnson at the time the agreement was signed may assist a fact finder to assess the intent of the parties and the meaning of the clause. As the Court is required to view the facts in the light most favorable to the non-movant, the Court cannot conclude that there are no extrinsic facts on this record that would assist a proper determination of the parties' intent. The Court denies George Johnson's motion for summary judgment on this ground.

### 5. The Defendants' Breach of Contract

#### a. Breach of the BCOP Agreement and General Release by Sousa and Johnson

Messrs. Sousa and Johnson assert that "OfficeMax has no evidence that either Sousa or Johnson has breached any provision of their respective 'WAIVER OF CLAIMS AND GENERAL RELEASE.'" *Sousa and Johnson Summ. J. Mot.* at 4; *Sousa and Johnson Summ. J. Reply* at 3–4. Specifically, they assert that there is no evidence that they have solicited OfficeMax customers and no evidence that they used or disclosed to W.B. Mason or failed to return to OfficeMax any OfficeMax confidential information. *Sousa and Johnson Summ. J. Mot.* at 4.

OfficeMax rejects the notion that there is no "credible evidence of record, which, at a minimum, demonstrates disputed material facts regarding the unsupported assertion by Defendants' Counsel that Defendants in no manner violated their respective noncompetition and severance agreements with OfficeMax." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 9. In support,

OfficeMax cites the Defendants' failure to return "their external memory devices on their final day of employment with OfficeMax, combined with forensic evidence that indicates that files on the usb drives in their possession were accessed subsequent to their employment with W.B. Mason." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 9. OfficeMax further asserts that, even though the Defendants make a "sweeping assertion" that there "is no evidence that either Defendant solicited OfficeMax customers for W.B. Mason in violation" of the agreements, the Defendants "do not refer to any affidavit, interrogatory answer, or other supporting document for this assertion." *Id.* at 10. Instead, OfficeMax says the Defendants rely on "a single affidavit provided by their Counsel, which . . . provides no meaningful, factual support as key portions of the affidavit are inadmissible." *Id.*

OfficeMax also counters with its own motion for summary judgment as to Mr. Sousa's violation of the confidentiality provisions in his BCOP Agreement, saying that Mr. Sousa violated paragraph 3 of his BCOP agreement and paragraph 4a of his general release by failing to return two usb drives containing OfficeMax's confidential information, including a presentation entitled "Q2 2009 Business Review." *Pl.'s Sousa and Johnson Summ. J. Mot.* at 6–8. Mr. Sousa in turn says that OfficeMax has not shown it suffered any harm as a result of his retention of the usb drives or presentation, has not shown that the usb drives were owned by OfficeMax, and that "[t]here is simply no evidence from which a fact-finder could conclude that this temporary deprivation of copies of largely outdated OfficeMax

sales training materials caused any cognizable injury to OfficeMax." *Sousa Summ.*

*J. Opp'n* at 11.

### b.    Confidentiality

The confidentiality provisions in Messrs. Sousa and Johnson's BCOP

Agreements and their General Releases cover nearly identical territory. The BCOP

Agreements provide a non-exclusive list of confidential information[17] and provide

that Messrs. Johnson and Sousa:

> will not divulge such confidential information or trade secrets to any
> person, firm, or institution . . . [and] upon termination of my
> employment . . . will continue to treat such confidential information
> and trade secrets as private and privileged, and will not, either for my
> own purposes or as an employee of or for the benefit of any other entity
> or person, use such information or disclose it to any person, firm, or
> institution.

*Sousa BCOP Agreement* at 1; *Johnson BCOP Agreement* at 1. The General Releases

similarly require that they "forever preserve the confidentiality of all confidential

and proprietary information of the Company." *Sousa Release* at 1; *Johnson Release*

at 1.

Messrs. Johnson and Sousa's motion for summary judgment is oddly framed.

Neither Mr. Johnson nor Mr. Sousa at any time says that he did not breach the

confidentiality agreement. Instead, each Defendant asserts that OfficeMax "has no

---

[17] The confidential information listed in the BCOP Agreements includes:

> the names, addresses, price lists, purchasing histories and requirements of customers
> and potential customers; location, region, and company financial reports, sales and
> service manuals and bulletins; cost information and patterns; floor plans and
> drawings of facilities; marketing strategies; acquisition and expansion plans; and
> other similar information.

*Johnson BCOP Agreement* at 1; *Sousa BCOP Agreement* at 1.

evidence" that he "failed to return any genuinely confidential information, that he disclosed any information to W.B. Mason, or that he used any such information." Sousa and Johnson SMF ¶¶ 7, 14. For support, the Defendants cite OfficeMax's Answers to Interrogatories 10 and 11. *Id.*

Interrogatory 10 and OfficeMax's response states:

State the basis of the statement in your Preliminary Injunction Motion at page 2 that:

> "[I]t is clear that neither Sousa nor Johnson have returned all of OfficeMax's confidential information . . . which undoubtedly they are using to the competitive disadvantage of OfficeMax."

In your response, state the following:'

(a)     Identify the "confidential information" you contend Sousa has not returned to OfficeMax;

RESPONSE: OfficeMax contends that Sousa has not returned all "confidential information" previously provided to him. This includes information which OfficeMax believes Sousa saved to various thumb / flash drives that he connected to his laptop computer. Details concerning such are set forth in the Declaration of Jayson Sullivan, dated February 19, 2010, which was previously served.

(b)     Describe in detail all information and evidence you have that Sousa is "using [this confidential information] to the competitive disadvantage of OfficeMax;"

RESPONSE: OfficeMax objects to Interrogatory 10(b) because it seeks information protected by the attorney work product doctrine. OfficeMax also objects to Interrogatory 10(b) because this request is premature and unfairly prejudicial based upon the ongoing discovery process.

(c)     Describe in detail the investigation you conducted before making this allegation, including everything you did to satisfy your obligations under Rule 11 of the Fed. Rules Civ. Pro.

RESPONSE: OfficeMax objects to interrogatory No. 10(c) because it seeks information protected by the attorney work product doctrine, the attorney client privilege, and because it seeks information not relevant to discovery.

*Pl.'s Resp. to Def. Denis Sousa's First Set of Inter. to Pl.* at 12. Interrogatory 11 states:

State the basis of the statement in your Preliminary Injunction Motion at page 25 that:

"Additionally, upon information and belief, both Sousa and Johnson have used or disclosed to W.B. Mason OfficeMax's confidential information in violation of their agreements with OfficeMax."

*Id.* at 12–13. OfficeMax objected to each subpart of Interrogatory 11, asserting that the interrogatory was 1) premature and unfairly prejudicial; 2) sought information protected by the attorney work product doctrine; or 3) sought information not relevant for discovery. *Id.* There is no suggestion that OfficeMax ever supplemented these responses.

OfficeMax's responses to these Interrogatories reflect the contentious nature of this litigation. If OfficeMax's responses came before the Court as a part of a discovery dispute, the Court would again take a dim view of OfficeMax's frivolous objections and failure to supplement its responses. However, as framed, OfficeMax's responses do not support the Sousa / Johnson statements of material fact 7 and 14 because the OfficeMax responses are either non-responsive or objections.

Furthermore, OfficeMax's response to the Sousa/Johnson statements of material fact is also unusual. It objects to these paragraphs on the ground that

they do not assert a fact but state a legal conclusion and seek "to invade the attorney work product." Resp. to Sousa and Johnson SMF ¶¶ 7, 14. The Court overrules these objections. In addition, OfficeMax does not actually deny the allegations. Rather, in each response it refers the Court to certain exhibits. *Id.* For statement of material fact 7, OfficeMax states:

> Subject to and without waiving its stated objections, *see* Exhibit H, OfficeMax's objections and responses in its Supplemental Response to Interrogatory No. 2, No. 5; *see also*, Exhibit B, Declaration of Jayson Sullivan.

*Id.* ¶ 7. For statement of material fact 14, OfficeMax states:

> Subject to and without waiving its stated objections, *see* Exhibit I, OfficeMax's objections and responses in its Supplemental Response to Interrogatory No. 2, No. 5; *see also*, Exhibit B, Declaration of Jayson Sullivan (discussing issues concerning the access of data files from a memory drive subsequent to Johnson's employment with OfficeMax); Exhibit C, Declaration of David Tillotson (discussing Johnson's contact of OfficeMax customers he serviced during his employment with OfficeMax).

*Id.* ¶ 14. OfficeMax never filed its own statement of additional material facts in response to the Johnson-Sousa statements of facts, so the Court is left with this unsatisfactory record.

The record is inadequate for a number of reasons. First, the Defendants placed the issue before the Court in an oblique fashion; they have not filed an affidavit saying they did not disclose confidential information but have only challenged OfficeMax to produce evidence that they did so. In turn, OfficeMax did not point to specific evidence that rebuts the Defendants' claims; instead OfficeMax generally referred the Court to interrogatory responses and unspecified portions of affidavits. OfficeMax's response violates the local rule. D. ME. LOC. R. 56(c) (stating

that the opposing statement "shall admit, deny or qualify the facts"), 56(f) (stating that an assertion of fact "shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion"). Then, OfficeMax requested and received additional time to produce direct evidence of a violation and produced none.[18]

Furthermore, OfficeMax's references do not clarify the evidence that it contends generates a genuine issue of material fact. OfficeMax's "objections and responses" in its Supplemental Response to Interrogatories 2 and 5 are wholly unilluminating. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 8, 9. The supplemental response to Interrogatory 2 alleges only that the harm OfficeMax suffered as a result of Mr. Sousa's conduct includes the loss of Mr. Steele and two other sales employees in Vermont, and other harm "which cannot be readily quantified" without deposing the Defendants and five other non-party witnesses. None of this amounts to evidence of a breach of confidentiality and, in fact, admits to a lack of evidence. *Id.* The response to Interrogatory 5 lists a series of paragraphs within the Release Agreement that OfficeMax contends the Defendants violated and then refers to a long series of documents, none of which is before the

---

[18] On July 16, 2010, OfficeMax moved for additional discovery under Rule 56(d), saying that it needed time to conduct the depositions of Mr. Johnson and Mr. Sousa to explore whether either Mr. Johnson or Mr. Sousa had violated the agreements, specifically including their confidentiality provisions. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* at 6. In fact, OfficeMax said that the depositions of Mr. Johnson and Mr. Sousa will allow it to determine "whether or not Defendants have improperly used or disclosed OfficeMax's proprietary, confidential information, and in doing so, violated the terms of their noncompetition and severance agreements with OfficeMax." *Id.* Based on these representations, the Court granted the motion and allowed OfficeMax to conduct further discovery on this issue. *Rule 56(d) Order.* However, OfficeMax failed to file any supplemental pleadings regarding either Mr. Johnson or Mr. Sousa's breach of the confidentiality provisions of the agreements.

Court. *Id.* The entire sequence is curious. If Mr. Johnson and Mr. Sousa deny violating the confidentiality provisions of the agreements, it is odd that they would not have filed an affidavit to that effect in support of their motion for summary judgment and if they admit the violations, it is odd that OfficeMax would not have supplemented its summary judgment pleadings to that effect.[19]

The Court has been left by the parties to slog through a mire of incomplete answers, reflexive objections, and local rule violations.[20] Even amid this confusion, the record—viewed in the light most favorable to OfficeMax—supports the conclusion that both George Johnson and Denis Sousa were exposed to and possessed OfficeMax confidential information. Tom Polcaro, OfficeMax's Regional Vice President, explained that both Mr. Sousa and Mr. Johnson were "regularly exposed to an extensive amount of OfficeMax information that is highly confidential and/or proprietary." *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 13 ¶¶ 16, 17 (*Polcaro Decl.*). This information included OfficeMax's sales and pricing strategies, its marketing strategies and practices, its profit margins, its strengths and vulnerabilities in servicing customers, and the identity and purchasing history and future needs of OfficeMax's customers. *Id.* ¶ 10, 17.

Additionally, as regards OfficeMax's claims against Denis Sousa, Jayson Sullivan—Senior Security Engineer, Enterprise Information Security Management

---

[19] The sequence is more like a criminal case where it is not uncommon for the defendant to remain silent and challenge the Government to prove the case. Unless a Fifth Amendment privilege is being asserted, this tactic is unusual in a civil context because the opposing party can be forced to respond to direct questions in discovery.

[20] The Court is aware that in the initial response to a discovery request, it is not unusual to posit protective objections. What is different here is that the respondent failed to answer the requests, and moreover, failed to clean up the responses before summary judgment.

for OfficeMax—states that an external memory device attached to Mr. Sousa's laptop was not returned to OfficeMax and contained a file entitled "Business Review Q2 2009 Maine Final.ppt," which was accessed on December 3, 2009. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 2 ¶¶ 11–12 (*Sousa Johnson Sullivan Decl.*).

Peeking through the fog of litigation, the Court concludes that there exist questions of fact as to Messrs. Sousa and Johnson's possession of OfficeMax confidential information. The much more difficult question is whether the parties' documents have raised a genuine issue of material fact as to whether either Mr. Johnson or Mr. Sousa breached the agreement by divulging or using confidential information. There is no direct evidence on this issue. The only question is whether OfficeMax has raised a triable issue by establishing that these Defendants possessed confidential information after they left OfficeMax employment; in other words, whether a fact finder could infer that the reason they accessed OfficeMax confidential information after they left employment with OfficeMax was to use it against OfficeMax. In this context, the line is between drawing forbidden "improbable inferences," *Sutliffe*, 584 F.3d at 325, and drawing permissible "reasonable inferences in [OfficeMax's] favor," *Merchs. Ins. Co. of N.H. v. U.S. Fid. and Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998).

After carefully reviewing the parties' submissions, the Court concludes that OfficeMax has made an evidentiary showing sufficient to generate a genuine issue of material fact as to Denis Sousa's use of confidential information in violation of

the BCOP Agreement and General Release, but has not made the same evidentiary showing as to George Johnson. Even though Mr. Sousa posits an innocent explanation for his actions, the Sullivan Declaration contains evidence that Mr. Sousa accessed OfficeMax confidential information after he left OfficeMax employment and a jury could infer that the reason he accessed it was to use it. The same evidence is simply not in this record as against Mr. Johnson. The Sullivan declaration does not implicate Mr. Johnson and there is no other evidence in this record that confirms he did so. Accordingly, a fact finder would not have an evidentiary basis on which to conclude that Mr. Johnson violated the confidentiality provisions of the Agreement.

At the same time, the Court concludes that summary judgment cannot be granted in favor of OfficeMax as to Mr. Sousa's violation of the confidentiality provisions. *See Pl.'s Sousa and Johnson Summ. J. Mot.* at 6–8. The record is simply not sufficiently developed to conclude that Mr. Sousa's retention of two usb drives of unknown origin constitute a breach of contract. First, the ownership of the usb drives remains a matter of dispute. Furthermore, the Court agrees with Mr. Sousa that OfficeMax has not shown any damage as a result of Mr. Sousa's retention of the information—a necessary element of a breach of contract claim. *See In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 8, 4 A.3d 492, 495–96 ("[A]ctual injury or damage is an element of both negligence and breach of contract claims."). Moreover, it remains a question of fact as to whether— assuming Mr. Sousa's retention of the information—such actions would constitute a

breach of a material contract term. *See Frost v. Me. Dep't. of Transp.*, No. Civ.A. CV-02-237, 2005 WL 3340215, at *9 (Me. Super. Oct. 7, 2005) ("[T]"he plaintiff bears the burden of proof in establishing (1) a breach of material contract terms; (2) causation; and (3) damages."). It is unclear what the "return" of digital data means in this context since OfficeMax has not said that it did not already possess a copy of the information on the usb drives. Viewed in the light most favorable to Mr. Sousa, a "return" of the data may have involved emailing OfficeMax a copy of something it already possessed. Whether this would constitute a material breach is a matter for the jury.

The Court therefore grants in part George Johnson's and denies in full Denis Sousa's and OfficeMax's motions for summary judgment on the claim of breach of confidentiality provisions.

### c. Noncompetition

OfficeMax and Messrs. Johnson and Sousa filed dueling motions for summary judgment on whether there is a genuine issue of material fact concerning the alleged violation of the noncompetition provisions in the BCOP Agreements and General Releases. The noncompetition provisions are similar. Messrs. Johnson and Sousa's BCOP Agreements prohibit "[f]or a period of 12 months after termination [from] BCOP . . . engage[ing] in the sale or distribution of office supplies, office furniture, or related office products or services, in any geographic territories I was assigned by BCOP in the 12 months prior to my termination of employment." *Sousa BCOP* Agreement at 1; *Johnson BCOP Agreement* at 1. The General Releases prohibit "solicit[ing] or attempt[ing] to solicit customers or prospective

customers on which Associate called for OfficeMax for the purpose of selling or distributing products or services similar to or competitive with those sold or distributed by OfficeMax." *Sousa Release* at 3; *Johnson Release* at 3. The major substantive difference between the BCOP Agreement and the General Release is the temporal scope; the BCOP Agreement lasts "[f]or a period of 12 months after termination [from] BCOP," while the General Release prohibits competition "during the period which severance is paid." *Sousa BCOP* Agreement at 1; *Johnson BCOP Agreement* at 1; *Sousa Release* at 3; *Johnson Release* at 3.

In connection with its opposition to the Defendants' summary judgment motion, OfficeMax's evidence of George Johnson's violation of the noncompetition clauses is the Declaration of David Tillotson, Key Account Manager for OfficeMax, who states that various OfficeMax customers told him that, after June 1, 2010, they received sales calls from Mr. Johnson on behalf of W.B. Mason. Specifically, Mr. Tillotson asserts that Mr. Johnson made sales calls to Elliot Hospital, New London Hospital, Catholic Medical Center, Concord Hospital and Colby Sawyer College. *Pl.'s Opp'n to Johnson and Sousa Summ. J. Mot.* Attach. 3 ¶¶ 10–13 (*Tillotson Decl.*). Mr. Tillotson also provided an email chain in July 2010 between Mr. Johnson and Helen Sieburg of Colby Sawyer College discussing sales by W.B. Mason of "Aspen 100 paper." *Id.* ¶ 12; *Tillotson Decl.* Attach. A.

OfficeMax has provided evidence for a reasonable jury to find Mr. Johnson competed with OfficeMax after June 1, 2010. This is sufficient to create issues of material fact as to whether he violated the noncompetition provision in his BCOP

Agreement, which was effective for one year after the date of his termination—October 13, 2010. However, the noncompetition provision in George Johnson's General Release was effective only for the 26 weeks during which he received severance pay—until April 13, 2010. Proof of competition after June 1, 2010, is insufficient to create issues of material fact of violations before April 13. The Court grants George Johnson's motion for summary judgment as regards OfficeMax's claims under the noncompetition provision of his General Release and denies the motion as regards the BCOP Agreement.

Regarding OfficeMax's allegations of Denis Sousa's violation of the noncompetition provisions, the Court also finds that there are genuine issues of material fact sufficient to deny summary judgment as regards his BCOP Agreement but also as to his general release. OfficeMax refers to its supplemental response to Messrs. Johnson and Sousa's Interrogatory No. 5, which in turn refers to the Declaration of Megan Babb, previously submitted in support of OfficeMax's motion for a preliminary injunction. Resp. to Sousa and Johnson SMF ¶ 7; *Mot. for Prelim. Inj.* Attach. 4 (*Babb Decl.*). Ms. Babb, a Business Development Manager for OfficeMax who previously worked for W.B. Mason, states that she observed Mr. Sousa attend weekly sales meetings in December 2009, learned of sales proposals that Mr. Sousa was working on at that time, and heard him at one point remark, "It's good to be here, we're going to kick OfficeMax's butt!" *Babb Decl.* ¶¶ 6–7. Ms. Babb's observations are sufficient to create issues of fact as to Mr. Sousa's

competition with OfficeMax, both under his BCOP Agreement and his General Release.

The Court turns to whether OfficeMax is entitled to summary judgment in its claims of breach of these agreements. In addition to those arguments that they asserted in their motion for summary judgment, Messrs. Sousa and Johnson offer a number of additional arguments: first, that OfficeMax has not authenticated George Johnson's BCOP Agreement, *Johnson Summ. J. Opp'n* at 7–8; second, that OfficeMax has no evidence that Mr. Johnson's solicitation of its customers was the proximate cause of harm to OfficeMax, *id* at 8–9; and third, that the BCOP agreements are void as against public policy, *id* at 12–16.

The Court has already addressed the Defendants' third contention—that the BCOP agreements violate public policy—and has concluded that there remain questions of fact as to the reasonableness of the restrictions. *See supra* Part II.C.3. As to Johnson's first argument—that OfficeMax has failed to authenticate his BCOP Agreement—Johnson cites *Carmona v. Toledo,* 215 F.3d 124, 131 (1st Cir. 2000), which says that "[t]o be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)." *Johnson Summ. J. Opp'n* at 7. The 2010 Amendments to Rule 56 move the substance of Rule 56(e), as cited by the First Circuit in *Aponte-Rosario*, to subsection (c)(4). The commentary to the 2010 explains:

> Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. *The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is*

*omitted as unnecessary* given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.

FED. R. CIV. P. 56 advisory committee's note to 2010 Amendments, Subdivision (c) (emphasis added).

The Court concludes that OfficeMax satisfied *Carmona* by the Declaration of Tracy Lentz, which authenticates the BCOP Agreement as "a true and accurate copy of the document that I maintain for OfficeMax in the aforementioned file cabinet relating to George H. Johnson." *Pl.'s Reply to Def. Denis Sousa's Opposing Statement of Material Facts (Doc. No. 162) and Def. George Johnson's Opposing Statement of material Facts (Doc. No. 167) Pl.'s Reply to Defs.'* RPSMF) Attach. 1 ¶ 5 (*Lentz Decl.*).[21]

Turning to Messrs. Johnson and Sousa's second argument, that OfficeMax cannot show proximate cause, George Johnson admits that he contacted OfficeMax customers at least as early as "the week of June 14, 2010, eight (8) months after he was fired." *Johnson* RPSMF ¶ 37; *Johnson Summ. J. Opp'n* at 2. According to Mr. Johnson, he "has called upon several OfficeMax customers, but very few of those customers have switched any of their business to W.B. Mason," allegedly because his role at OfficeMax meant that "it had been several years since Johnson had been

---

[21] The document is identical to the *Johnson BCOP Agreement* that OfficeMax attached to its Opposition to Messrs. Johnson and Sousa's summary judgment motion, and does not bear Mr. Johnson's signature, but contains the words "Johnson, George" in pencil at the top right corner of the first page and again below the date line on the last page. *Lentz Decl.* Attach. A at 1–2. Lacking Johnson's signature, it is disputed whether Johnson signed a noncompetition agreement with BCOP. *Johnson Summ. J. Opp'n* at 7; *Johnson* RPSMF ¶¶ 1, 40–42. Mr. Johnson says he does not remember signing an agreement with BCOP in 1999, only an earlier version in 1996, which OfficeMax has not produced. *Johnson* RPSMF ¶ 1, 40–42. Ms. Lentz' affidavit still complies with *Carmona*. The dispute generates a contested fact to be weighed by the jury.

a sales representative with day-to-day contact with customers." *Johnson Summ. J. Opp'n* at 3; *Johnson* RPSMF ¶¶ 38, 49. Similarly, Denis Sousa admits to contacting one of OfficeMax's former customers at least as early as "mid-July 2010, more than nine (9) months after they were fired by OfficeMax." *Sousa* RPSMF ¶ 25.

Messrs. Johnson and Sousa target OfficeMax's evidence of causation for OfficeMax's loss of Dartmouth College as a customer. *Johnson Summ. J. Opp'n* at 5–6; *Pl.'s Reply to Defs.'* RPSMF ¶ 56. They say that OfficeMax's loss of Dartmouth was the result of a successful proposal by W.B. Mason that "offered [Dartmouth] significant up front money and held all core pricing for 3 years," and not because they "sat in on one meeting with Dartmouth's independent consultants" who were evaluating OfficeMax's and W.B. Mason's sales proposals. RPSMF ¶ 25; *Johnson Summ. J. Opp'n* at 5; *Sousa Summ. J. Opp'n* at 8. The Defendants assert that "OfficeMax has presented no record evidence whatsoever that Dartmouth awarded this contract to W.B. Mason because [the Defendants] sat in on one meeting with Dartmouth's independent consultants." *Sousa Summ. J. Opp'n* at 8. *Johnson Summ. J. Opp'n* at 6. OfficeMax, on the other hand, says that Dartmouth College had no intention of switching its supplier until it met with W.B. Mason representatives, including Messrs. Johnson and Sousa, on July 10, 2010. *Pl.'s Sousa and Johnson Summ. J. Reply* at 17. According to OfficeMax, the facts "admit[] of one conclusion," that Johnson and Sousa's "intimate knowledge of [Dartmouth's] office supply needs" gave W.B. Mason an unfair advantage and

resulted in OfficeMax's loss of the client. *Pl.'s Sousa and Johnson Summ. J. Reply* at 18.

Mr. Johnson also targets OfficeMax's evidence of causation for its loss of Catholic Medical Center and Hypertherm as OfficeMax customers. *Johnson Summ. J. Opp'n* at 6; *Johnson* RPSMF ¶ 65; PR *Johnson* RPSMF 56. As to the former, he says that it was already buying from W.B. Mason before his first contact and that there is no evidence that it left OfficeMax because of him. *Johnson Summ. J. Opp'n* at 6. Regarding the latter, Mr. Johnson points to sales records allegedly showing that Hypertherm switched its business to W.B. Mason in February 2010, at least four months before Mr. Johnson first contacted it. *Id.* Ultimately, whether Messrs. Johnson and Sousa are responsible for OfficeMax's loss of Dartmouth, Catholic Medical Center and Hypertherm as clients is a matter of fact for the jury.

In short, there are sufficient material facts in dispute to preclude summary judgment for OfficeMax on this point. The Court denies OfficeMax's motion for summary judgment on the BCOP noncompetition agreement as regards both Defendants and as regards Mr. Sousa's General Release.

### 6. Breach of the BCOP Agreement by John Steele

Echoing Messrs. Sousa and Johnson's arguments, John Steele asserts that there is no evidence of breach of contract. First, he asserts that OfficeMax cannot "prove it had a contract with the Defendant, that the Defendant breached the contract, and that the Plaintiff suffered damages as a result of the breach. *Steele Summ. J. Mot.* at 7. Maintaining that "OfficeMax has not produced any assignment of [the Steele BCOP Agreement] nor has it produced any corporate records or other

documents to prove that it is a corporate successor" to BCOP, Mr. Steele challenges not only the evidence of breach, but whether OfficeMax is even party to the Steele BCOP Agreement. *Id.*; *Steele Summ. J. Reply* at 1–2, *Steele Supp. Summ. J. Reply* at 1–2.

Second, Mr. Steele asserts—as did Messrs. Sousa and Johnson—that there is no evidence that he impermissibly solicited customers or that he took, used or disclosed OfficeMax's confidential information. *Steele Summ. J. Mot.* at 7–8; *Steele Summ. J. Reply* at 2–4, *Steele Supp. Summ. J. Reply* at 2–6. Third, Mr. Steele argues that "OfficeMax has no evidence that it has incurred any damages as a result of Steele's alleged breach." *Steele Summ. J. Mot.* at 8; *Steele Summ. J. Reply* at 3–4.

OfficeMax presses its belief that there exist genuine issues of material fact as to Steele's alleged breach of his "obligations" to OfficeMax. *Pl.'s Opp'n to Steele Mot.* at 10. First, OfficeMax cites Mr. Steele's discussions with W.B. Mason before his departure from OfficeMax and his alleged attempts on his final day at OfficeMax to print an Excel spreadsheet containing customer and sales information and phone calls that he supposedly made to OfficeMax customers. *Id.* at 11; *Pl.'s Supp. Opp'n to Steele Mot.* at 2–3. Second, OfficeMax cites Mr. Steele's post-resignation conduct, specifically, his retention of twenty-four boxes of OfficeMax information and the alleged use of his knowledge of OfficeMax profit margins when quoting prices to prospective W.B. Mason customers. *Pl.'s Supp. Opp'n to Steele Mot.* at 7–10.

### a.    Assignment of the Steele BCOP Contract

Challenging Mr. Steele's contention that OfficeMax has not proven it is a successor-in interest to BCOP, OfficeMax submitted the Certificate of Amendment of Certificate of Incorporation for BCOP. The certificate states in part that "The name of this corporation [formerly BCOP] is OFFICEMAX CONTRACT, INC." *Pl.'s Opp'n to Steele Mot.* Attach. 13. This is sufficient to defeat Mr. Steele's assertion in his summary judgment motion that there is no evidence of assignment of the BCOP Agreement to OfficeMax.[22]

### b.    Noncompetition

OfficeMax states in its summary judgment motion against Mr. Steele that it is no longer "alleging that Steele has violated the noncompetition provision (i.e., Paragraph 4) of his agreement with OfficeMax." The Court grants Mr. Steele's motion for summary judgment on this issue.

### c.    Confidentiality

The confidentiality provision in Mr. Steele's BCOP Agreement is identical to the Johnson and Sousa Agreement. *See supra* Part II.B.5.b. The lynchpin of the claimed violation of this provision is that Mr. Steele possessed OfficeMax confidential information and that he then disclosed or used it.

---

[22] On February 7, 2011, OfficeMax moved to supplement its opposition to Mr. Steele's summary judgment motion with a document indicating that on November 1, 2004, BCOP, after merging with its subsidiary, Hunter Creek, Inc., changed its name to OfficeMax Incorporated. *Pl.'s Request to Supplement Pl.'s Ex. N to Its Opp'n to Def. Steele's Mot. for Summ. J.* (Docket # 241). The Defendants opposed the supplementation. *Defs.' Opp'n to OfficeMax's Request to Supplement Pl.'s Exhibit N to Its Opp'n to Def. Steele's Mot. for Summ. J.* (Docket # 242). OfficeMax replied. *Pl.'s Reply to Defs.' Opp'n to Pl.'s Request to Supplement Pl.'s Ex. N to Its Opp'n to Def. Steele's Mot. for Summ. J.* (Docket # 243). Because Attachment 13 to OfficeMax's opposition to Mr. Steele's summary judgment motion was sufficient to withstand summary judgment, the Court need not consider whether additional evidence should be allowed. OfficeMax's motion to supplement is therefore dismissed without prejudice.

Viewed in the light most favorable to OfficeMax, the evidence of Mr. Steele's actual possession of OfficeMax confidential information is more than enough to raise a triable issue. Interrogatory responses and a declaration by Jayson Sullivan demonstrate that on November 23, 2009—John Steele's final day at OfficeMax—he opened and attempted to print a spreadsheet that had been emailed to him on November 18, 2009, by Ms. Deneen Morotta, OfficeMax's District Sales Manager.[23] *Pl.'s Interrog. Resp.* at 5; *Pl.'s Opp'n to Steele Mot.* Attach. 6 ¶¶ 10–12 (*Steele Sullivan Decl.*). The spreadsheet contained data including some under the column labels: "CUST (number)," "CUSTNAME," and "ROLLING 12 MTH SALES." *Steele Sullivan Decl.* ¶ 10. At deposition, Mr. Steele acknowledged that the document was "going to be my customer file, my new list of people I would be waiting on," that he printed the document, and that he took the document home with him. *Dep. of John Steele* 136:24–25, 124:1–10 (Docket # 124) (*Steele Dep.*).

According to OfficeMax, Mr. Steele acknowledged at deposition that he had discussed moving to W.B. Mason before his vacation, and OfficeMax says that "Steele has no legitimate reason to print [the spreadsheet] or otherwise use it on November 23, 2009, as the evidence is clear that on or before November 23, 2009, Steele had already decided to leave OfficeMax." *Pl.'s Supp. Opp'n to Steele Mot.* at 4. Mr. Steele disputes OfficeMax's allegations and explains that when he arrived at OfficeMax on November 23 he had not decided to leave OfficeMax. The inference is

---

[23] OfficeMax's interrogatory responses claim that Mr. Steele was successful in his attempts to print the list. *Pl.'s Interrogs.* at 5. Mr. Sullivan states in his declaration that he was able to determine only that Mr. Steele attempted to print the list and was initially unsuccessful, but he could not determine whether Mr. Steele was later able to print the list. *Sullivan Decl.* ¶ 12.

that he did not print the list to retain confidential information, but simply because his supervisor, Deneen Morotta, had emailed it to him.

OfficeMax's version of events raises a genuine issue of material fact as to whether Mr. Steele had already resolved to leave OfficeMax when he printed the list. Moreover, even if Mr. Steele had not decided to accept W.B. Mason's offer, he acknowledged that he was in discussions with W.B. Mason and it is a fair inference that he printed and retained the customer list as a precaution. Further, after Mr. Steele left OfficeMax, he retained twenty-four boxes of OfficeMax information for a week. Although Mr. Steele explains that the delay in returning the boxes was due to the Thanksgiving holiday and the time it took to collect all of the materials that he had accumulated during his eighteen years at OfficeMax, again viewing the evidence in the light most favorable to OfficeMax, there is sufficient evidence from which a jury could conclude that his week-long retention of confidential information amounted to a violation of the confidentiality provision. *Steele Supp. Summ. J. Reply* at 4.

Finally, Steele admitted at deposition that he had access to, and did occasionally access OfficeMax's profit margin for the OfficeMax customer he was servicing:

> Q. When you were at OfficeMax, were you informed periodically of gross profit margin for accounts you were managing?
>
> A. It was something you could look up in the computer.
>
> Q. Did you ever do that?
>
> A. Yes.

*Steele Dep.* 100:24–101:5.

Mr. Steele's retention of confidential information, alone, does not necessarily violate the confidentiality provision; he must also use the information. The Court carefully reviewed OfficeMax's assertions of direct proof of Mr. Steele's use of confidential information and views the evidence as weak at best. As with Messrs. Johnson and Sousa, the question is whether a reasonable factfinder could infer use from possession. Again, despite Mr. Steele's denials and innocent explanations, the Court concludes that a factfinder could reasonably infer that he took the confidential OfficeMax information to use it. OfficeMax has pointed to the nature of the information Mr. Steele possessed, the volume of information he possessed, the circumstances of his possession, the timing of his possession, the delay in its return, and the manner of his leaving. These facts would permit, but not compel, an inference of use, and are sufficient to create a triable issue.

The Court denies John Steele's motion for summary judgment on whether he breached the confidentiality provisions of his Agreements.

### D. Summary Judgment Against John Steele's Counterclaims under OfficeMax's Compensation Plan

In Counts I through III of his counterclaims, John Steele alleges breach of contract (Count I), fraud (Count II) and violation of the Maine Timely and Full Payment of Wages Law (Count III). These three counterclaims are based on what he says are underpayments OfficeMax made by misleading its employees as to the proper calculation of their compensation. *Steele Answer and Countercls.* at 13–17. Specifically, a portion of Mr. Steele's compensation was a base salary and a portion

was tied to the revenue generated by his sales. Counts I through III of Mr. Steele's counterclaims address the revenue-based portion of his compensation.

### 1. Breach of Contract

The first question is whether the Compensation Plan should be viewed through the contractual lens urged by Mr. Steele's counterclaim Count I. OfficeMax strenuously argues that the Compensation Plan is not a contract, and that "Steele, therefore, had no contractual rights to a bonus, much less a bonus determined in any specific manner." *Pl.'s Steele Summ. J. Mot.* at 3. In the alternative, OfficeMax reasons that, viewing the Compensation Plan as a contract, its terms explicitly provide the manner of the incentive calculation, and negate Mr. Steele's arguments. *Pl.'s Steele Summ. J. Mot.* at 3.

The Court does not reach the latter argument as it is convinced that the Compensation Plan is not a contract and does not lend itself to a breach of contract claim. The Compensation Plan goes to great lengths to make clear it is not a contract, and contains explicit language to that point. For example, under the heading "Am I guaranteed to receive any payment under the plan?," the Compensation Plan explains, "No. . . . This document is designed only to communicate the basic provision of the plan and should not be construed as a contract between any participant and OfficeMax." *Steele Dep.* Attach. 1 at 16 (*Compensation Plan*); *Pl.'s Statement of Material Facts in Support of Mot. for Summ. J. on Countercls. Of Def. Steele* ¶ 14 (Docket # 123) (*Pl.'s Steele SMF*); *Def. John Steele's Opposing Statement of Material Facts* ¶ 14 (Docket # 173) (*Steele RPSMF*) (admitting that the Compensation Plan contained such language). Again,

under the heading "Does my participation in the plan guarantee my employment?," the Compensation Plan says, "No. . . . The plan is not and should not be thought of as a contract of employment." *Compensation Plan* at 18. Moreover, Mr. Steele admits that he signed an acknowledgment stating "I have read, understand, and agree to the terms of this Relationship Sales Associate Incentive Plan ("plan") and understand that *neither it nor any other written or verbal communication alters the status of my employment to anything other than at-will or otherwise creates a contract of employment*." *Steele Dep.* Attach. 2 (emphasis added); *Pl.'s Steele SMF* ¶ 16; *Steele* RPSMF ¶ 16.

These statements conclusively settle the issue. Nonetheless, even if such explicit disclaimers did not exist, other provisions in the document would render it a contractual nullity. "Under Maine law, 'a reservation to either party of an unlimited right to determine the nature and extent of his performance renders his obligation too indefinite for legal enforcement, making it, as it is termed, merely illusory.'" *Millien v. Colby Coll.*, 2005 Me 66, ¶ 9, 874 A.2d 397, 402 (quoting *Corthell v. Summit Thread Co.*, 132 Me. 94, 99, 167 A. 78, 81 (1933)); *Goodman v. President and Trs. of Bowdoin Coll.*, 135 F. Supp. 2d 40, 54 (D. Me. 2001). In *Millien*, the Maine Supreme Judicial Court upheld a ruling that a college student handbook setting forth the college's disciplinary system did not constitute a binding contract because the college reserved the right to unilaterally alter the terms without notice to the students. *Id.* So too, OfficeMax's Compensation Plan is replete with such invalidating reservations. In at least eight separate headings,

and footnoted at the bottom of every page, the plan reserves the right to change the plan in whole or in part at any time at OfficeMax's sole discretion. For example, under the Frequently Asked Questions heading, "Can the plan be changed or terminated?," the plan explains, "Yes. OfficeMax, in its sole discretion, may amend or terminate the plan at any time for any reason without notice." *Compensation Plan* at 18. Similar reservations are listed under descriptions of the "Payment Formula, Overview," *id.* at 4; Sales Quota, *id.* at 4–5; Margin Quota, *id.* at 5; On Target Earnings, *id.*; Calculation of Sales, *id.* at 9; and Calculation of Margin, *id.*

Although the indefiniteness created by an unlimited reservation clause may be cured by other contractual language such as a "good faith clause" or reasonableness language that limits the reserving party's right to define its term, such language is not present in the Compensation plan. *See Goodman*, 135 F. Supp. 2d at 54. OfficeMax could hardly have been more explicit. The Compensation Plan is not a contract and was not intended to be a contract, and under Maine law, it cannot be construed as a contract. *See Millien*, 2005 Me 66, ¶ 9, 874 A.2d at 402. A breach of contract claim cannot be maintained without a contract to breach. The Court thus grants OfficeMax's motion for summary judgment against Mr. Steele's Count I.

### 2. Fraud

The elements of a claim of fraud are well-settled:

> To sustain a fraud claim, a party must show: (1) that the other party made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing him to act in reliance upon it, and (5) he

> justifiably relied upon the representation as true and acted upon it to his damage."

*Darling v. Western Thrift & Loan*, 600 F. Supp. 2d 189, 197 (D. Me. 2009); *accord*

*Darling v. Indymac Bancorp, Inc.*, Civil No. 6-123-B-W, 2008 WL 3539518, at *8 (D.

Me. Aug. 12, 2008); *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992);

*Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 615 (Me. 1992).

Mr. Steele bears the burden to prove the claim of fraudulent misrepresentation by

"clear and convincing evidence." *Me. Eye Care Assocs., P.A. v. Gorman*, 2008 ME 36,

¶ 12, 942 A.2d 708, 711.

Mr. Steele's counterclaim alleges that when OfficeMax promulgated its

compensation plan, it "expressly and impliedly represented that the plan . . . would

be implemented in accordance with its express terms and would be implemented in

a fair and good faith manner." *Steele Answer and Countercls.* ¶ 8. Mr. Steele

further claims that OfficeMax expressly or implicitly represented that the "costs" it

used to calculate his gross profit margins and gross profit dollars "were in fact the

real costs charged to OfficeMax by its suppliers for the products that Steele sold."

*Id.* at 8. Mr. Steele asserts that OfficeMax had a duty to disclose to him that the

"costs" used for calculating gross profit margins and dollars "were not OfficeMax's

real costs." *Id.* ¶ 10.

OfficeMax protests it made no false representations. It says it never

represented the "cost" was the "actual" or "true" cost, but only the cost listed in the

item file. Further, the plan allows OfficeMax to "change its basis for calculating

margins in its sole discretion" so Mr. Steele could have no basis to rely on a particular cost. *Pl.'s Steele Summ. J. Mot.* at 4.

Mr. Steele counters by referring to the Merriam Webster Dictionary definition of "margin" as "the difference which exists between net sales and the cost of merchandise sold . . . ." *Steele Summ. J. Opp'n* at 10–11. He says that he learned through discovery in this action "that OfficeMax did not use its 'cost of merchandise' in calculating Steele's margin, but rather used dramatically inflated costs, which were determined by OfficeMax based upon a slew of random factors and events." *Id.* at 11. Regarding the language in the Sales Incentive Plan, Mr. Steele characterizes its contents as permitting OfficeMax "to cheat when calculating Steele's margin." *Id.* Mr. Steele goes on to say that even if the document were interpreted to favor OfficeMax on this point, the Plan was not issued until July 1, 2008, "so [it] could not have had any impact on Steele's compensation . . . before that date." *Id.* at 11–12. Moreover, Mr. Steele observes that OfficeMax itself contends that the Plan was not a contract "so it is unclear how the provisions of the 'Plan' could contractually bar Steele's claims." *Id.*

The language of the Incentive Plan does not support Mr. Steele's fraud claim.[24] The Incentive Plan creates both sales quotas and margin quotas for each salesperson and these are "the Incentive measures for the plan." *Pl.'s Steele SMF* ¶ 12 (providing that OfficeMax "will establish sales quotas and margin quotas for each participant"). After the end of each month or quarter, OfficeMax promises to

---

[24] In its statement of material facts, OfficeMax has focused on certain portions of the Incentive Plan, but these are necessarily somewhat out of context. The Incentive Plan has been attached and therefore the Court has reviewed and quoted other portions of the Plan.

"review the Incentive measures, the applicable quota, and your performance, and determine the Incentive (if any) payable under this plan." Under the Plan, "[s]ales and margin performance in excess of assigned quotas is rewarded with more pay." *Compensation Plan* at 3. OfficeMax warns, however, that it may "at any time establish different payment frequency or crediting periods or different incentive measures, quotas or incentive calculation formulas." *Pl.'s Steele SMF* ¶ 12. Further, OfficeMax may "unilaterally change quotas at any time during the plan year." *Id.* at 13.

The Incentive Plan contains a straightforward definition of "sales" as the dollar amount of merchandise sold to a customer, not including shipping and handling charges, state and local taxes, or other non-merchandise items or the gross amount of money paid by customers to OfficeMax on account of sales. *Id.* at ¶¶ 25, 26. This definition is not disputed. Instead, the dispute focuses on the calculation of "margin":

> The OfficeMax sales ledger (S/L) method will be used to calculate profit margin dollars. The sales cost method of determining margins is determined by the cost that has been loaded in the contract for a customer if the sales are on contract or item file cost if the sale is off contract. The company can change its basis for calculating margins in its sole discretion.

*Compensation Plan* at 9. Under this provision, the profit "Margin" is a function of an item's cost, which may be determined in one of two ways. *Pl.'s Steele SMF* ¶¶ 27, 29; *Steele* RPSMF ¶¶ 27, 29. First, if a customer has contracted to purchase an item, the cost is that listed in the contract. *Pl.'s Steele SMF* ¶ 30; *Steele* RPSMF ¶ 30. Second, if the cost is "off contract," the cost is determined "by reference to an

'item file cost.'" *Pl.'s Steele SMF* ¶ 31; *Steele* RPSMF ¶ 31. OfficeMax says, and Mr. Steele has admitted, that the "item file cost" is "a cost assigned to each item sold by OfficeMax that is standard across the entire OfficeMax organization and can be referenced by OfficeMax sales employees such as Steele by calling up that cost in OfficeMax's system at any time." *Pl.'s Steele SMF* ¶ 32; *Steele* RPSMF ¶ 32.

Nevertheless, Mr. Steele alleges that OfficeMax's method of determining "off contract" cost was fraudulent. *Steele Answer and Countercls.* at 15; *Steele* RPSMF ¶ 54. Mr. Steele says that he "understood that his Gross Profit Margin and Gross Profit Dollars were determined by subtracting from the prices products were sold to his customers the costs of those products to OfficeMax." *Steele* RPSMF ¶ 53. He goes on to say that he "learned of specific instances where the 'costs' of the products listed in OfficeMax's computer system were different than the cost figures he learned from OfficeMax's vendors." *Id.* Mr. Steele says that OfficeMax never "disclosed to Steele that his Gross Profit Margins and Gross Profit Dollars were calculated using 'costs' which were greatly inflated – thus driving down Steele's Gross Profit Margins and Gross Profit Dollars." *Id.* at ¶ 54. He alleges that during discovery, he found out that the "'costs' used by OfficeMax were randomly inflated by a variety of factors, which again were never disclosed to Steele" and that OfficeMax admitted that "these 'cost' numbers were often inflated by as much as 17%." *Id.* Mr. Steele asserts that OfficeMax "overstated the cost of goods sold by Steele by more than $350,000 and this caused his margin number to be 23.5% rather than the actual 30%." *Id.* at ¶ 55.

The Court agrees with OfficeMax that, even viewing the Compensation Plan in the light most favorable to Mr. Steele, OfficeMax made no false representations of any material fact. On careful inspection, the Court concludes that OfficeMax's promises in the Compensation Plan—at least as regards the margin for off-contract sales—are illusory. The contrast between costs delineated in the customer contract and off contract costs illustrates this point. For costs that are inserted in the customer contract, a salesperson could turn to the contract itself, find the figure, and check OfficeMax's calculation. However, for off-contract costs, the Compensation Plan provides only that the "item file cost" will determine the margin. The Compensation Plan does not define "item file cost" but the parties have agreed that it is a cost that OfficeMax assigns and that is standard throughout the Country. The Compensation Plan makes it clear that OfficeMax can "change its basis for calculating margins in its sole discretion."

If Mr. Steele discovered that the off-contract costs were not based on the item file, then he could claim that OfficeMax was defrauding him. But Mr. Steele cannot base a fraud claim upon the method by which OfficeMax calculates the "item file cost"; the Compensation Plan gives Mr. Steele no reason to believe that OfficeMax will adopt a particular method of calculation or even that if it adopts one method, it could not arbitrarily change it without violating the terms of the Plan.

Mr. Steele's real objection is that this Compensation Plan does not comport with his notions (or a dictionary definition) of gross profit margins. However, as regards item file cost, the Compensation Plan gave him no reason to conclude that

dictionary definitions would apply. The Court agrees with Mr. Steele that the Compensation Plan has an Alice In Wonderland quality to it.[25] For purposes of the Compensation Plan, OfficeMax is clearly the master of the meaning of the words. It alone determined how to calculate the item file cost and could "change its basis for calculating margins in its sole discretion" at any time. *Compensation Plan* at 9. Mr. Steele had no reason to think otherwise.

OfficeMax made no false representations to Mr. Steele as regards the calculation of item file cost. The Compensation Plan expressly provides no protection to OfficeMax salespeople.[26] Whether this is fair is one thing. Whether it is fraudulent is another. The Court grants OfficeMax summary judgment on John Steele's fraudulent misrepresentation claim against OfficeMax.

### 3. Violation of the Maine Timely and Full Payment of Wages Law

John Steele's final claim relating to OfficeMax's actions under its compensation plan is brought under the Maine Timely and Full Payment of Wages Law, 26 M.R.S. §§ 626 and 626-A. Section 626 requires that "[a]n employee leaving employment must be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid . . . ." Section 626

---

[25] "When I use a word, Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean – neither more nor less."
"The question is," said Alice, "whether you can make words mean so many different things."
"The question is," said Humpty Dumpty, "which is to be master – that's all."
LEWIS CARROLL, THROUGH THE LOOKING GLASS 72 (1871).
[26] The Court does not know what to make of Mr. Steele's contention that the Plan was not issued before July 1, 2008, so it could not have any impact on his right to compensation before that date since the gravamen of Mr. Steele's complaint is that OfficeMax fraudulently violated the terms of the Plan by miscalculating the item file cost. If Mr. Steele has a fraudulent misrepresentation claim for the period before the OfficeMax Compensation Plan, the record is insufficient to support it.

further defines a "reasonable time" as "the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made." *Id.* According to Mr. Steele, OfficeMax violated this law because, "[b]y secretly and fraudulently using inflated 'cost' figures in calculate[ing] Steele's compensation, OfficeMax has failed and refused to pay Steele his wages when due . . . ." *Steele Answer and Countercls.* at 16. Section 626-A provides penalties of $100 to $500 for each violation of section 626.

OfficeMax makes three arguments in favor of summary judgment on Mr. Steele's section 626 claim. First, it says that Steele did not meet the statute's requirements on how and where to file a dispute. *Pl.'s Steele Summ. J. Mot.* at 5–6. Second, it says that the wages Mr. Steele seeks are properly regarded as bonuses, not covered by the statute, and that in any event, recovery under section 626 is governed by the compensation plan, which OfficeMax may adhere to at its discretion. *Id.* at 6–9. Third, OfficeMax argues that Mr. Steele's claims are barred by the statute of limitations, express contractual provisions, waiver, laches and equitable estoppels. *Id.* at 10–14.

The Court turns to OfficeMax's first argument: that any claim falling under section 626 fails because "[t]here is no record evidence that Steele ever made a demand of any kind for unpaid wages, much less a demand at the OfficeMax office where payrolls are kept and wages are paid," as is required by the statute. *Pl.'s Steele Summ. J. Mot.* at 5. Mr. Steele responds that his counterclaim provides the requisite demand for wages, and that "[t]here is not the remotest suggestion in

either the statute or the case law that a pre-filing demand is required to maintain a suit for unpaid wages." *Steele Summ. J. Opp'n* at 12–13.

The Court agrees with Mr. Steele. "Section 626 does not define 'demand,' nor does it specify that the demand must be . . . made at a particular time." *Burke v. Port Resort Realty Corp.*, 1999 ME 138, ¶ 9, 737 A.2d 1055, 1059. A lawsuit is a demand in its sharpest form and OfficeMax "cannot seriously contest" that it was not on notice that Mr. Steele was pressing a section 626 statutory claim for unpaid wages.[27] *Id.* When viewed in the light most favorable to Mr. Steele, service of process on OfficeMax is sufficient in the Court's view to generate a factual question as to whether he complied with the requirement that the demand be filed "at the office of the employer where payrolls are kept and wages are paid."[28] 26 M.R.S. § 626.

---

[27] There is another issue, not raised by OfficeMax. A section 626 violation occurs where a former employer does not make payment a "reasonable time" after a demand has been made by the former employee. 26 M.R.S. § 626. If the employee is making the demand at the time he is filing suit for failure to pay, then the employer has necessarily not been given a "reasonable time" to pay. Here, OfficeMax fulfilled Mr. Steele's prophetic Complaint. However, OfficeMax does not raise, and the Court does not address, whether Mr. Steele or his attorneys had a proper antecedent basis for filing suit under Section 626. *See* FED. R. CIV. P. 11 ("By presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.").

[28] This provision has not been interpreted judicially. Presumably it is there to assure that a proper person within the employer's organization receives the wage demand, particularly in view of what the Maine Supreme Court has said is the "harsh" effect of the statute. *Purdy v. Community Telecommunications Corp.*, 663 A.2d 25, 28 (Me. 1995). A casual demand by an employee in the field to his supervisor would arguably not comply. However, here, service of process of a lawsuit on an authorized agent of the employer alleging a statutory violation of section 626 would appear to constitute actual notice of the claim to an authorized individual and should meet the notice requirement. This seems so particularly in light of the way the Maine Supreme Judicial Court has interpreted the other notice requirements of the law. *See Burke*, 1999 ME 138, ¶ 9, 737 A.2d at 1059. In the context of a motion for summary judgment, service of process at the very least generates a triable question as to whether the employer received notice under the law.

The Court rejects OfficeMax's second argument—that Mr. Steele seeks recovery of a bonus, which falls outside the scope of the statute. Preliminarily, there is at least a genuine issue of material fact as to whether an incentive payment to Mr. Steele under the Compensation Plan should be characterized as a "bonus."[29] OfficeMax asserts that "Steele was paid on a combination of base salary and potential bonuses," *Pl.'s Steele SMF* ¶ 8, and in support, cites his deposition where he acknowledged that his allegations concerned the "potential impact on your bonus related compensation, not the part of [his] compensation that was fixed." *Steele Dep.* 163:14–18. Mr. Steele denies that his compensation package included a "bonus," and refers to OfficeMax's compensation plan for 2008. *Steele* RPSMF ¶ 8. The 2008 compensation plan explains that "[a] portion of the total targeted compensation of each of the eligible positions is tied to sales performance measures established by OfficeMax . . . ." *Compensation Plan* at 3." It speaks primarily in terms of "target incentives" and "On Target Earnings," *id.* at 5–6, occasionally using other words such as "targeted compensation," or "pay," *id.* at 3, all of which are consistent with additional commissions.

In any event, the Court need not dwell on the precise terminology since the applicability of section 626 does not turn on whether Steele's compensation is labeled a "bonus" or an "incentive." The Maine Supreme Judicial Court has emphasized that section 626 is intended to be read broadly in accordance with its

---

[29] In his opposition, Mr. Steele broadly asserts that "nowhere in the [Compensation Plan] is the word bonus used." *Steele Summ. J. Opp'n* at 12. This is incorrect. In page 3, the Compensation Plan states that to be eligible, an employee may "not be a participant in any other OfficeMax bonus or Incentive program," implying that the Compensation Plan is a bonus program. *Compensation Plan* at 3.

protective purposes. *See Burke v. Port Resort Realty Corp.*, 1999 ME 138, ¶ 9, 737 A.2d 1055, 1059 ("The purpose of section 626 is to 'provide a broad guarantee of prompt payment of wages to all employees on termination.'" (quoting *Community Telecomms. Corp. v. Loughran*, 651 A.2d 373, 376 (Me. 1994))). The statute provides that "[a]n employee leaving employment "must be paid *in full* within a reasonable time after demand." 26 M.R.S. § 626 (emphasis supplied). Thus, in accordance with *Burke's* directive, this Court holds that "incentives" of the sort described in OfficeMax's compensation plan fall within the ambit of section 626. *See Burke*, 1999 ME 138, ¶ 8, 737 A.2d at 840 (treating a "commission" as a "wage" under section 626); *Purdy*, 663 A.2d at 28 (including earned commissions within the definition of wages and rejecting the employer's argument that section 626 is limited to hourly wage employees); *Cmty. Telecomm. Corp. v. Loughran*, 651 A.2d 373, 376 (Me. 1994) (stating that "broad definition of wages to include commissions is in keeping with the protective purpose of the act").

OfficeMax presses the additional point that, even if section 626 covers "bonuses," recovery under the law is limited to what is provided under the compensation plan which, according to OfficeMax, is determined at its sole discretion. *Pl.'s Steele Summ. J. Mot.* at 8–9. Quoting *Warner v. Atkinson Freight Lines Corp.*, 350 F. Supp. 2d 108, 119 (D. Me. 2004), OfficeMax explains that "the Maine Wage Payment Statues themselves do not entitle plaintiffs to receive any particular amount of money." *Pl.'s Steele Summ. J. Mot.* at 8. OfficeMax reasons that if the compensation plan is not viewed as a contract, then Mr. Steele is not

entitled to recover anything under section 626, and if the compensation plan is viewed as a contract, then he still is not entitled to any recovery "because the Incentive Plan also leaves it to OfficeMax's unilateral discretion as to the terms by which bonus payments are made, or indeed, whether bonus payments are made at all." *Id.* at 9.

"Under Maine law, 'the employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid.'" *Warner*, 350 F. Supp. 2d at 119 (quoting *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 9, 770 A.2d 97, 101); see *also Burke*, 1998 ME 193, ¶ 5, 714 A.2d at 839; *Purdy,* 663 A.2d at 28–29; *Rowell v. Jones & Vining, Inc.,* 524 A.2d 1208, 1210–11 (Me.1987). The Court has already concluded that the compensation plan is not a contract or employment agreement. This is not fatal to a claim under section 626 since the Supreme Judicial Court has previously affirmed payment under section 626 even where payment was not premised on either a contract or employment agreement. *See Bernier*, 2001 ME 17, ¶¶ 2, 9, 770 A.2d at 100–101 (affirming a ruling granting treble damages under section 626 for commissions that were promised in a memorandum from a company president).

Moreover, the Court is persuaded by the Supreme Judicial Court's emphasis on the purpose of section 626 to "provide a broad guarantee of prompt payment of wages to all employees on termination." *Burke v. Port Resort Realty Corp.*, 1999 ME 138, ¶ 9, 737 A.2d 1055, 1059. With this goal in mind, the Court concludes that, although the compensation plan allowed OfficeMax to make changes to the plan at

its discretion, it could not—at least without some explicit reservation—make changes retroactively. In other words, Mr. Steele was due whatever was authorized by the compensation plan at the time of each sale. OfficeMax's argument that its unilateral discretion to change the plan also authorized its retroactive rescindment of incentives that were otherwise earned is incompatible with the broad protections intended by section 626.

Finally, the Court considers OfficeMax's argument that Steele cannot recover under the compensation plan because any claims are "barred by the statute of limitations and express contractual provisions, as well as the doctrines of waiver, laches and equitable estoppel." *Pl.'s Steele Summ. J. Mot.* at 10. OfficeMax questions when Mr. Steele became aware that the costs used to calculate his incentive pay were not the actual costs that OfficeMax incurred. According to OfficeMax, Mr. Steele recalls only two miscalculations in his incentive pay: the first about ten years ago and the second in 2007. *Pl.'s Steele SMF* ¶¶ 17, 18, 20. OfficeMax says Mr. Steele never raised this issue "with anyone at OfficeMax who had responsibilities in connection with his compensation." *Pl.'s Steele SMF* ¶ 21.

OfficeMax points to 14 M.R.S. § 752[30] for the precept that "[a]ny compensation issues Mr. Steele had more than six years prior to the filing of his counterclaims are categorically barred from now asserting by the statute of

---

[30] "All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state, or of a justice of the peace in this State, and except as otherwise specially provided." 14 M.R.S. § 752.

limitations."[31]  *Pl.'s Steele Summ. J. Mot.* at 10.  In response, Mr. Steele says that the statute of limitations should be tolled because he was unaware until the commencement of discovery that the cost had been so pervasively inflated and because there have been several compensation schemes since Steele first learned of the cost miscalculations.  *Steele Summ. J. Opp'n* at 13.  He also says that the statute of limitations is not implicated because no cause of action accrued until his employment ended.  *Id.*

The Court does not need to reach the question of whether Mr. Steele's ten-year-old claim survives summary judgment.  It is clear on this record that his 2007 claim falls within the six year statute for civil actions and therefore his cause of action survives OfficeMax's dispositive motion.

The Court next turns to OfficeMax's assertion of waiver and equitable estoppels.  In 2009, the Maine Supreme Judicial Court summarized the waiver doctrine:

> Waiver is "a voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party."  If a party in knowing possession of a right acts inconsistently with the right or that party's intention to rely on it, the right is deemed waived.  "To bar enforcement of a known right, the waiver, however established, must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights."

---

[31] OfficeMax also argues that if the Court views the compensation plan contractually, "Steele gains no advantage because Steele is barred from asserting any claims not otherwise barred by the statute of limitations by the express terms of the Incentive Plan," which provide that "you must file a claim in writing within 60 days after the event giving rise to the claim."  *Pl.'s Steele Summ. J. Mot.* at 10. As the Court has already determined that the Incentive Plan is not a contract, it does not address this argument.

*Blue Start Corp. v. Ckf Props., LLC*, 2009 ME 101, ¶ 26, 980 A.2d 1270, 1277 (quoting *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 919 (Me. 1976)) (internal citations omitted). The determination is a matter of fact. *Couri Pontiac, Inc.*, 355 A.2d at 919 (citing *Colbath v. Stebbins Lumber Co.*, 127 Me. 406, 144 A. 1 (1929)). "In determining the question of waiver, the Court must therefore look not only to the conduct of [the plaintiff] but also to the effect of those acts on [the defendant] who now claims it was thereby lulled into a false security." *Id*.

Equitable estoppel is similar to waiver except it "focuses on misleading conduct rather than intention." *Chalet Susse Intern., Inc. v. Mobil Oil Corp.*, 597 A.2d 1350, 1353 (Me. 1991) (citing *Roberts v. Me. Bonding & Cas. Co.*, 404 A.2d 238, 241 (Me. 1979); *accord Blue Start Corp*, 2009 ME 101, ¶ 27, 980 A.2d at 1277 ("Equitable estoppel requires a misrepresentation that 'may arise through a combination of misleading statements, conduct, or silence.'" (quoting *Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630, 635)). "Equitable estoppel 'precludes a party from asserting rights which might perhaps have otherwise existed . . . against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right.'" *Blue Start Corp.*, 2009 ME 101, ¶ 27, 980 A.2d at 1277 (quoting *Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d at 635).

The factual waters are too murky to conclude that Mr. Steele intentionally relinquished a known right or that OfficeMax relied in good faith on his conduct to

its detriment. OfficeMax points to Mr. Steele's knowledge of two incidents of cost miscalculation. *Pl.'s Steele SMF* ¶ 17. Mr. Steele replies that he did not realize these two incidents indicated that all costs were inaccurate and he did not know the degree to which the costs were inflated. *Steele* RPSMF ¶¶ 53–54; *Steele Summ. J. Opp'n* at 13. What Steele knew and when he knew it remain in dispute and the Court cannot determine on this contested record whether Mr. Steele intentionally relinquished a known right or that OfficeMax reasonably relied on his conduct to its detriment. *See Chalet Susse Intern., Inc.*, 597 A.2d at 1352–53.

The Court denies OfficeMax's motion for summary judgment on John Steele's claim that OfficeMax violated 26 M.R.S. § 626.

### E. Steele's Defamation Counterclaim

Mr. Steele claims that OfficeMax has defamed him based on two incidents. First, he charges that OfficeMax's allegations in Paragraphs 38 and 39 of the Complaint, alleging that he stole a list of OfficeMax customers and sales was false and made "in reckless disregard of its truth or falsity." *Steele Answer and Countercls.* at 22. Second, Mr. Steele says that a letter OfficeMax sent to W.B. Mason's CEO, which attached a copy of the Complaint, contains "false and defamatory statements about Steele."[32] *Steele Summ. J. Opp'n* at 8.

In Maine, defamation consists of:

(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;

---

[32] Mr. Steele originally based his defamation counterclaim, in part, on letters OfficeMax allegedly sent to his former colleagues still at OfficeMax and that referenced OfficeMax's lawsuit against the Defendants. *Steele Answer* at 22. However, "Steele is no longer pursuing this instance of defamation." *Steele Summ. J. Opp'n* at 8

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Morgan v. Kooistra*, 2008 ME 26, ¶ 26, 941 A.2d 447, 455; *Rice v. Alley,* 2002 ME 43, ¶ 19, 791 A.2d 932, 936; *Cole v. Chandler*, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193; *Lester v. Powers,* 596 A.2d 65, 69 (Me. 1991).

Neither OfficeMax's Complaint nor its letter to W.B. Mason's CEO may form the basis of a defamation suit as they are both privileged. Turning first to OfficeMax's Complaint, it is settled law in Maine that "allegations made in pleadings are absolutely privileged." *Dineen v. Daughan*, 381 A.2d 663, 664 (Me. 1978). This privilege attaches to otherwise defamatory third-party communications preliminary to or during litigation only as long as the "remarks are pertinent to the judicial proceeding" and not "unnecessary or unreasonable." *Simon v. Navon*, 951 F. Supp. 279, 282 (D. Me. 1997).

The Court concludes that OfficeMax's letter to W.B. Mason's CEO, including a copy of the Complaint, was pertinent to the case, and was neither unnecessary nor unreasonable. The letter stated that OfficeMax intended to subpoena from W.B. Mason "all documents and information relating to any of the factual matters or issues set forth in the enclosed Complaint,"[33] it listed the types of documents that should be preserved, and stated that a subpoena would be forthcoming. *Steele RPSMF* ¶ 50; *Pl.'s Reply to Def. John Steele's Opposing Statement of Material Facts*

---

[33] OfficeMax admits it mailed a document preservation letter and copy of the complaint to W.B. Mason's CEO. Since OfficeMax objects to Mr. Steele's characterization of the letter, the Court quotes the letter.

¶ 50 (Docket # 199) (*Pl. Reply to Steele* RPSMF); *Pl.'s Steele SMF* Attach. 3 at 1. The letter made three factual assertions: that Steele had been sued by OfficeMax, that he had worked for OfficeMax until late 2009, and that he now works for W.B. Mason—all factually true statements which cannot form the basis of a defamation suit. That OfficeMax should seek to have potentially crucial evidence preserved in anticipation of discovery strikes this Court as pertinent to the case and entirely necessary and reasonable. Nor does OfficeMax's attachment of the Complaint to the letter change this analysis.

The Court grants OfficeMax's motion for summary judgment on John Steele's defamation claim.

### F.     The Defendants' Abuse of Process Counterclaims

The Defendants' abuse of process counterclaims allege that, at the time OfficeMax filed suit, it "knew that it had no good faith basis to believe that [the defendants] had violated [their] [agreements] or otherwise committed any wrongful act[s] . . . [and] [was] actuated by actual malice . . . ." *Steele Answer and Countercls.* at 20–21; *Johnson Countercls.* at 4–5; *Sousa Countercls.* at 4–6. Messrs. Johnson and Sousa and Mr. Steele make slightly different allegations in their Counterclaims.

### 1.     George Johnson and Denis Sousa Abuse of Process Allegations

Messrs. Johnson and Sousa make identical abuse of process allegations against OfficeMax. *Johnson Countercls.* ¶¶ 15–23; *Sousa Countercls.* ¶¶ 17–25. They say that when OfficeMax filed its Complaint against them, it did not have a

good faith basis to believe that either of them had violated the General Release or committed any wrongful act. *Johnson Countercls.* ¶ 16; *Sousa Countercls.* ¶ 18. They say that when OfficeMax hand-delivered a copy of the Complaint and a document preservation letter to W.B. Mason's CEO and, in March 2010, served W.B. Mason with a subpoena *duces tecum*, it was acting improperly with the ulterior motive of causing W.B. Mason to terminate Messrs. Johnson and Sousa, tortiously interfering with W.B. Mason's advantageous economic relations with Messrs. Johnson and Sousa and other OfficeMax employees, and threatening and intimidating OfficeMax's current employees. *Johnson Countercls.* ¶¶ 19, 21; *Sousa Countercls.* ¶¶ 21, 23.

### 2. John Steele's Abuse of Process Allegations

In his abuse of process counterclaim, Mr. Steele joins in the Johnson-Sousa allegations about the OfficeMax letter to W.B. Mason's CEO and about the March 2010 subpoena *duces tecum*. *Steele Answer and Countercls.* ¶ 39, 42–44. In addition, Mr. Steele alleges that in its Complaint, OfficeMax falsely alleged that Mr. Steele had printed out a list of his OfficeMax customers and their sales and had stolen this document for his benefit and for the benefit of W.B. Mason. *Id.* ¶ 38. He says that the information OfficeMax alleges he stole was emailed to him by his superior at OfficeMax and that he had returned the information to OfficeMax when he left. *Id.* Mr. Steele adds that when OfficeMax sent the document preservation letter to W.B. Mason's CEO, it falsely claimed that he had stolen a list of his customers. *Id.* ¶ 40. Finally, he claims that OfficeMax's allegation that Mr. Steele

had solicited its customers in violation of his Agreement was based solely on a false assertion about a conversation between an OfficeMax sales employee and Robert Sellers of Norway Savings Bank—a conversation that Mr. Steele says never took place. *Id.* ¶ 41.

### 3. OfficeMax's Motion for Summary Judgment

OfficeMax seeks summary judgment against the abuse of process counterclaims because it says that its causes of action against Messrs. Steele, Johnson and Sousa were based on agreements each of them had signed prohibiting them from disclosing OfficeMax confidential information to benefit themselves or a third party, namely W.B. Mason. *Pl.'s Steele Summ. J. Mot.* at 15; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 16–17. Thus, OfficeMax argues its causes of action against the Defendants were to vindicate its own rights, not to have the Defendants terminated at their new employer. *Pl.'s Steele Summ. J. Mot.* at 16; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 17. OfficeMax says that W.B. Mason was aware of the OfficeMax restrictive covenants even before it hired Messrs. Steele, Sousa, and Johnson, and therefore the letter to the W.B. Mason CEO did not convey any new information and had no impact on their employment. *Pl.'s Steele Summ. J. Mot.* at 15–16; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 16–17.

### 4. The Defendants' Response

The Defendants first note that OfficeMax's document preservation letter enclosing the Complaint and its subpoena *duces tecum* were both "process" for purposes of an abuse of process claim. *Steele Summ. J. Opp'n* at 6; *Sousa Summ. J.*

*Opp'n* at 18; *Johnson Summ. J. Opp'n* at 16. They say that bad faith motive can be inferred from the circumstances and, in abuse of process claims, can be inferred from the acts themselves. *Steele Summ. J. Opp'n* at 6; *Sousa Summ. J. Opp'n* at 19; *Johnson Summ. J. Opp'n* at 16. Even though W.B. Mason did not fire any of the Defendants, alter their compensation, or change their jobs, they say that they each suffered emotional distress as a consequence of OfficeMax's actions, a type of damage they claims is recoverable in an abuse of process claim. *Steele Summ. J. Opp'n* at 7; *Sousa Summ. J. Opp'n* at 20; *Johnson Summ. J. Opp'n* at 17–18.

The basis for Mr. Johnson's abuse of process claim is limited to the letter to W.B. Mason's CEO, the subpoena *duces tecum*, and OfficeMax's filing suit. Mr. Steele and Mr. Sousa have made additional specific allegations. Mr. Steele points to OfficeMax's accusation, which he says is false, that he stole an OfficeMax customer list. *Steele Summ. J. Opp'n* at 6–7. Mr. Sousa says that after OfficeMax learned that Mr. Sousa had joined W.B. Mason, its in-house counsel sent Mr. Sousa a letter dated November 2, 2009, demanding that he sign a statement saying he would not work for W.B. Mason and at the same time, sent a letter to W.B. Mason threatening lengthy litigation and falsely representing that John Steele had signed an agreement which prevented him from competing with OfficeMax for 12 months after their departure from OfficeMax. *Sousa Summ. J. Opp'n* at 19.

### 5.    OfficeMax's Reply

OfficeMax replied that the Defendants had failed to demonstrate OfficeMax's actions amounted to the improper use of legal process. *Pl.'s Steele Summ. J. Reply*

at 1–2. It defended its subpoena *duces tecum* as appropriate under Federal Rule of Civil Procedure 26, noting that W.B. Mason produced documents in response to the subpoena and did not seek a protective order. *Id.* at 2–4. Further, it says that its letter to W.B. Mason was entirely proper and, while bad faith can be inferred from an improper act, the reverse is not true. *Id.* at 2–3. OfficeMax criticizes the Defendants' inferences of bad faith motivation as completely speculative. *Id.* at 3. OfficeMax emphasizes that abuse of process is limited to extreme circumstances not present in this case. *Id.* at 4. Finally, OfficeMax says that the abuse of process counts fail because the Defendants have failed to present a "specific link" between the process and its alleged improper motive. *Id.* at 4–5.

### 6.     Discussion

#### a.     The Defendants' Claims

The Defendants rely on four pieces of evidence to challenge OfficeMax's motion for summary judgment on this claim: 1) the fact of the filing of the lawsuit; 2) a letter and copy of the Complaint sent by OfficeMax to W.B. Masons' CEO; 3) a subpoena *duces tecum* directed to W.B. Mason; and 4) a November 2, 2009 letter sent by OfficeMax's general counsel to Mr. Sousa threatening to file suit if he worked for W.B. Mason.

#### b.     OfficeMax Motion as to John Steele

OfficeMax's motion against John Steele is defective because there are no statements of material fact addressing the issue of abuse of process. OfficeMax's statement of material facts in support of its motion for summary judgment on Mr.

Steele's counterclaim consists of thirty-six separate paragraphs but none mentions any facts underlying Mr. Steele's claim of abuse of process. *Pl.'s Steele SMF*. The Court is able take judicial notice of the filing of the Complaint in this case and will reach that issue. Otherwise, however, OfficeMax has failed to present the Court with a statement of material facts that would justify summary judgment in its favor as against Mr. Steele on the abuse of process claim.

Oddly, however, Mr. Steele's statement of additional material facts saves OfficeMax's motion. *Def. John Steele's Opposing Statement of Material Facts* (Docket # 180). In his Statement of Additional Material Facts, Mr. Steele mentions the January 30, 2010 letter from OfficeMax to the W.B. Mason CEO attaching the Complaint.[34] *Id.* ¶¶ 50, 51.

### c. OfficeMax Motion as to George Johnson and Denis Sousa

Unlike its motion against Mr. Steele, OfficeMax presented a statement of material facts that addresses some of the facts underlying the Johnson and Sousa abuse of process claims. *Statement of Material Facts in Support of Pl.'s Mot. for Partial J. Against Defs. Sousa and Johnson as to Counts One and Two* (Docket # 126). In its statement of material facts, OfficeMax mentions the January 29, 2010, letter to W.B. Mason's CEO and the subpoena *duces tecum*. *Id.* ¶¶ 29–32. In his

---

[34] Mr. Steele's statement of material facts references the subpoena *duces tecum* somewhat abstractly. Statement of fact number 50 explains that OfficeMax's letter to W.B. Mason stated OfficeMax's intent "to subpoena from W.B. Mason a vast quantity and array of documents and electronic information . . ." *Def. John Steele's Opposing Statement of Material Facts* ¶ 50. Statement of fact number 51 explains that this letter was later delivered. *Id.* ¶ 51. This is sufficient reference for summary judgment purposes to put into play the subpoena *duces tecum* and Mr. Steele's allegation that it constituted an abuse of process. *See* BLACK'S LAW DICTIONARY 1467 (8th ed. 2004) (defining a subpoena *duces tecum* as "A subpoena ordering the witness to appear and to bring specified documents, records, or things").

statement of additional material facts, Mr. Johnson adds that when the CEO of W.B. Mason received the January 30, 2010 letter, he was very concerned that it would lead to his termination and this caused him extreme anxiety and emotional distress. *Def. George Johnson's Opposing Statement of Material Facts* (Docket # 167). There is no other mention, however, of the facts underlying the abuse of process claim.

In Mr. Sousa's statement of additional material facts, he mentions the November 3, 2009 letter from OfficeMax in-house counsel, threatening to sue him and cut off his severance payments because he had accepted a job with W.B. Mason. *Sousa* RPSMF ¶¶ 40–41.

### d. Abuse of Process: Legal Principles and Analysis

"The Maine law as to the precise definition of and essential elements of a claim for abuse of process is somewhat arcane and indistinct."[35] *Grace v. Yarnall*, 346 F. Supp. 2d 222, 224 (D. Me. 2004). Nonetheless, Maine law has identified two elements necessary to sustain an abuse of process claim: "1) a use of the process in a manner not proper in the regular conduct of the proceedings and, 2) the existence of an ulterior motive." *Id.* at 224 (quoting *Nadeau v. State*, 395 A.2d 107, 117 (Me. 1978)); *Simon v. Navon*, 71 F.3d 9, 15 (1st Cir. 1995) ("The two basic elements of abuse of process are a bad motive, and the use of a legal process for an improper, collateral objective."). Abuse of process may be demonstrated "if a Plaintiff can

---

[35] The authors of Maine Tort Law explain that many abuse of process cases reflect "an age before the United States Supreme Court decisions limited a plaintiff's right to seize property and persons to collect debts prior to judicial adjudication of the dispute." JACK H. SIMMONS, DONALD N. ZILLMAN & DAVID D. GREGORY, MAINE TORT LAW § 3.06 (2004 ed.)

show an improper use of process for an immediate purpose other than that for which it was designed and intended." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 682 (1977)). "Typical abuse of process cases involve misuse of such procedures as discovery, subpoenas, and attachment." *Id.* Good faith is a defense to a claim of abuse of process. *Saliem v. Glovsky*, 172 A. 4, 6 (Me. 1934).

Maine law quickly resolves one of the disputed issues: whether emotional damages are available for an abuse of process claim. They are. In 1934, the Maine Supreme Judicial Court included "mental injury" in a list of damages potentially available for abuse of process. *Id.* Simply because W.B. Mason did not fire, demote, or punish any of the former OfficeMax employees does not mean they cannot maintain a cause of action for emotional injury.

In *Simon v. Navon*, 71 F.3d 9 (1st Cir. 1995), the First Circuit illuminated the limitations of an abuse of process cause of action. *See Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 7, 708 A.2d 283, 286 ("The decision of the court in *Navon* is consistent with our decisions involving abuse of process claims"). The *Simon* Court distinguished between the torts of malicious prosecution and abuse of process, noting that malicious prosecution requires "that the challenged litigation was initiated without probable cause and with malice, and that it terminated in the plaintiff's favor." 71 F.3d at 15. The First Circuit explained that "malicious prosecution is the appropriate cause of action for challenging the whole of a lawsuit—i.e., asserting that the suit has no basis and should not have been

brought—while abuse of process covers the allegedly improper use of individual legal procedures *after* a suit has been filed properly." *Id.* (emphasis in original).

The *Simon* court emphasized that, to prevail on an abuse of process claim, the proponent must "prove the two requisite elements of the cause of action: ulterior motive *and* an act of abuse." *Id.* at 16. However, "the 'regular' use of process, such as the filing of a lawsuit, "may not on its own fulfill the requirement of an abusive act, even if the decision to sue was influenced by a wrongful motive, purpose or intent." *Id.* A court may not "presume[] that [a plaintiff] filed [a] lawsuit solely to achieve a collateral objective based on evidence of motive alone. [The plaintiff] need[s] to produce evidence independent of motive to prove that an improper act occurred in the [plaintiff's] pursuit of litigation." *Id.* In other words, evidence of a "bad motive" is "not enough." *Id.* The requirement could be satisfied by "evidence of a threat made explicitly to [the defendant] or a disclosure confided to a third party that the [plaintiffs] planned to file suit solely to hurt [the defendant's] credit rating." *Id.* In short, the abuse of process plaintiff must show a "specific link" between the lawsuit and an impermissible, collateral purpose. *Id.*

Under *Simon*, the Court is able to readily conclude that the filing of the lawsuit alone does not provide a basis for an abuse of process claim. *Id.* at 16. There is no evidence in this record that OfficeMax filed the causes of action against these defendants for any purpose other than to enforce the terms of their employment agreements.

A similar logic applies to OfficeMax's issuance of a subpoena *duces tecum*. A subpoena *duces tecum* is a "regular" legal process. *Simon* cites a case of a proper abuse of process claim involving the issuance of subpoenas for 87 teachers for the same day, thereby paralyzing normal school operations. *Id.* (citing *Farmingdale Union Free Sch. Dist. v. Farmindale Classroom Teachers Ass'n*, 38 N.Y.2d 397 (1975)). Here, there is no evidence that the subpoena was issued improperly or that anyone at OfficeMax confessed to anyone that the reason it was filing suit or issuing the subpoena was for reasons unrelated to those legal processes. Furthermore, as *Simon* points out, the courts retain the ability through the civil rules to sanction parties who file papers for any improper purpose. *Id.* at 17. If W.B. Mason thought the subpoena was oppressive, too expensive, or sought for an improper ulterior motive, it could have brought its position to the attention of the court. It did not.

For both the filing of the lawsuit and the issuance of the subpoena, absent direct evidence, the Defendants urge that the Court infer bad motive. This is insufficient. *Tanguay v. Asen*, 1998 ME 277, ¶ 5, 722 A.2d 49, 50 (stating that "[r]egular use of process, such as the filing of a lawsuit, cannot constitute abuse, even if a decision to act or a decision not to act, was influenced by a wrongful motive"). Neither claim can stand.

The two remaining allegations involve the letter to W.B. Mason's CEO and the letter to Mr. Sousa. The January 30, 2010 OfficeMax letter to W.B. Mason's CEO informing him of the lawsuit and asking for document preservation does not on its face represent an abuse of process. By January 30, 2010, OfficeMax had filed

suit against these Defendants and a letter to their new employer asking that it preserve documents is generally unremarkable. Although the counterclaim plaintiffs would like to infer that OfficeMax harbored an improper purpose—namely the Defendants' termination by W.B. Mason—there is no evidence in this record that OfficeMax sent the letter for a collateral ulterior objective, and absent such evidence, the claim cannot stand.

The Defendants' evidence—specifically, the letter from Allison Stein, Associate General Counsel of OfficeMax—is sufficient to allow only Mr. Sousa's abuse of process claim to survive summary judgment. Attorney Stein's letter explains that "[e]mployment by a competitor of OfficeMax breaches the Confidential Information and Noncompetition Agreement (para. 4) which prohibits you from working for a competitor for 12 months after your departure from OfficeMax."[36] *Decl. of Stephen W. Rider with Respect to Pl.'s Mot. for Summ. J. Against Sousa and Johnson* Attach. 8 at 1. In the letter, OfficeMax requests assurances, under threat of litigation, that "you are not currently employed by W.B. Mason and have no plans to be employed by W.B. Mason." *Id.*

Whatever paragraph 4 of Mr. Sousa's BCOP Agreement says about the limits of Mr. Sousa's future competition with OfficeMax, it does not say that Mr. Sousa was prohibited from working for and could not work for any OfficeMax competitor—whatever the capacity. For example, Mr. Sousa's employment as a janitor for W.B. Mason would not conflict with the noncompetition agreement. OfficeMax's request

---

[36] The Court understands the letter to be based upon Sousa's BCOP Agreement, which contains a 12 month restriction on competition, and not on Sousa's General Release, which contains a 39 week prohibition on competition

that Mr. Sousa relinquish any employment with W.B. Mason goes beyond what was contractually required of him and provides sufficient basis from which a jury could conclude that the lawsuit was intended to achieve an improper purpose—namely his voluntary or forced termination from W.B. Mason.

The Court grants OfficeMax's summary judgment motion on the Defendants' counterclaims for abuse of process except for Mr. Sousa's abuse of process claim based on the Allison Stein letter.

### G. The Defendants' Declaratory Judgment Counterclaims

The Court finally turns to OfficeMax's motions for summary judgment on the Defendants' counterclaims seeking declaratory judgments that the BCOP Agreements are void and unenforceable and that the restrictive covenants within the BCOP Agreements are void as against public policy. Between its two summary judgment motions against Messrs. Sousa and Johnson and Mr. Steele, OfficeMax collectively raises a number of arguments. First, OfficeMax argues that the BCOP Agreement is not void as against public policy. *Pl.'s Steele Summ. J. Mot.* at 22; *Pl.'s Sousa Johnson Reply.* at 14–15; *Pl.'s Sousa and Johnson Summ. J. Mot.* at 14–15. Second, it argues that the Johnson and Sousa General Releases do not reciprocally void their BCOP Agreements. *Pl.'s Sousa and Johnson Summ. J. Mot.* at 12–14; *Pl.'s Sousa Johnson Reply.* at 12–14. Third, OfficeMax asserts that it retains an interest in protecting its confidential material even though OfficeMax terminated Messrs. Sousa and Johnson's employment. *Pl.'s Sousa and Johnson Summ. J. Mot.* at 14–15

The Court has already considered the substance of the Defendants' arguments for voiding the BCOP Agreements and its noncompetition provision. To summarize, the Court concludes that: (1) the Defendants' without-cause termination does not, as a matter of law, render the noncompetition provisions unenforceable,[37] *see supra* Part II.C.1; (2) Messrs. Sousa and Johnson's General Releases do not void their BCOP Agreements, but only settle any previous claims the parties may have had, *see supra* Part II.C.2; (3) whether the BCOP Agreements are voided by Maine public policy remains a question of fact, *see supra* Part II.C.3; (4) whether the language in Mr. Johnson's BCOP Agreement includes not-for-cause terminations is a question of fact, *see supra* Part II.C.4; (5) there is no evidence that Mr. Johnson breached the confidentiality provisions in his BCOP Agreement and General Release and summary judgment in his favor is appropriate, but there is a question of material fact as to Mr. Sousa's violation of the confidentiality provisions of his BCOP Agreement and General Release, *see supra* Part II.C.5.b; (6) there remains a question of fact as to whether Mr. Johnson violated the noncompetition provision in his BCOP Agreement, but summary judgment is appropriate as to allegations that he violated his General Release; and there remains an issue of fact as to whether Mr. Sousa violated the noncompetition provisions in both the BCOP Agreement and the General Release, *see supra* Part II.C.5.c; (7) OfficeMax no longer

---

[37] Whether OfficeMax fired Mr. Steele or he quit is disputed. However, the conclusion would be the same whether Steele quit—as the Court would accept in reviewing Steele's summary judgment motion—or was terminated—as the Court would accept in reviewing OfficeMax's summary judgment motion. *See Merchs. Ins. Co. of N.H., Inc.*, 143 F.3d at 7 (explaining that the Court reads the record " "in the light most favorable to the non-moving party, drawing all reasonable inferences in [the non-movant's] favor").

asserts that Mr. Steele violated the noncompetition provision in his BCOP agreement and summary judgment is appropriately granted in Mr. Steele's favor, *see supra* Part II.C.6.b; and (8) there remains a question of fact as to Mr. Steele's violation of the confidentiality provision in his BCOP Agreement, *see supra* Part II.C.6.c.

Because the court has ruled either that there remain issues of fact or that summary judgment is appropriate for several of the Defendants but not for OfficeMax, it will not grant summary judgment against the Defendants' declaratory judgment counterclaims.

Finally, as regards Mr. Steele's request for declaratory judgment, OfficeMax maintains that it "is now moot as OfficeMax is no longer alleging a violation of [the noncompetition] provision." *Pl.'s Steele Summ. J. Mot.* at 22; *Pl.'s Steele Summ. J. Reply* at 8. The Court disagrees. Mr. Steele's declaratory judgment seeks more than a declaration of no violation of the noncompetition provision, but rather a declaration invalidating the entire BCOP Agreement. As OfficeMax has maintained its allegations of violation of the confidentiality provision, there remains an actual controversy justifying maintenance of Mr. Steele's counterclaim of invalidity.

## III. CONCLUSION

The Motion for Summary Judgment of Defendants Denis Sousa and George Johnson (Docket # 47) is hereby GRANTED as to OfficeMax Incorporated's claim against George Johnson for breach of the confidentiality provisions in the General

Release and BCOP Agreement and breach of the noncompetition provision in the general release, but is otherwise DENIED.

John Steele's Motion for Summary Judgment (Docket # 50) is GRANTED as to his breach of the noncompetition provision in the BCOP Agreement and is otherwise DENIED.

John Steele's Motion to Strike (Docket # 77) is DENIED.

OfficeMax Incorporated's motion for summary judgment against John Steele (Docket # 122) is GRANTED as to his counterclaims of breach of contract (Count I), fraud (Count II), abuse of process (Count V) and defamation (Count VI), and is otherwise DENIED.

OfficeMax Incorporated's motion for summary judgment against Dennis Sousa and George Johnson (Docket # 197) is DENIED as to Dennis Sousa's abuse of process claim regarding the letter from Allison Stein to Mr. Sousa, but is otherwise GRANTED as to both Messrs. Sousa and Johnson's abuse of process counterclaim and is DENIED in all other respects.

OfficeMax Incorporated's motion to exclude (Docket # 208) is GRANTED as to Mr. Gagne's testimony outside of his personal knowledge but is otherwise DENIED.

The Defendants' motion for sanctions against OfficeMax Incorporated (Docket # 211) is DISMISSED without prejudice.

OfficeMax Incorporated's motion to supplement its opposition to John Steele's motion for summary judgment (Docket # 241) is DISMISSED without prejudice.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2011